UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------X
CDR-Wantagh, Inc. and Christine D. Rivera,
individually and as Trustee for the benefit
of JAMES DELYANIS,

                             Plaintiffs,

                 - against -

SHELL OIL COMPANY and MOTIVA
ENTERPRISES LLC,

                         Defendants.
--------------------------------------------------------------X

**MEMORANDUM AND ORDER**
07-CV-4497 (DRH) (ETB)

**A P P E A R A N C E S :**

**ROSENBERG CALICA & BIRNEY LLP,**
Attorneys for Plaintiffs
100 Garden City Plaza
Suite 408
Garden City, New York 11530
By: Robert M. Calica, Esq.
    Megan F. Carroll, Esq.

**EPSTEIN BECKER & GREEN P.C.**
Attorneys for Defendants
250 Park Avenue
New York, New York 10177-1121
By: William A. Ruskin, Esq.
    Victoria Sloan, Esq.

**HURLEY, Senior District Judge:**

        This action arises out of the interpretation of a lease provision governing payment

of post-termination rent and property taxes.  Plaintiffs CDR-Wantagh Inc. ("CDR") and

Christine D. Rivera, individually and as Trustee for the benefit of James Delyanis (collectively,

"Plaintiffs"), move for partial summary judgment pursuant to Federal Rule of Civil Procedure

("Rule") 56 with respect to their first cause of action.  Defendants Shell Oil Company ("Shell")

and Motiva Enterprises LLC ("Motiva") oppose Plaintiffs' motion and cross-move for summary

judgment pursuant to Rule 56 dismissing all of Plaintiffs' claims. For the reasons that follow, both motions are denied.

## BACKGROUND

The material facts, drawn from the Complaint and the parties' Local 56.1 Statements, are undisputed unless otherwise noted.

## I. *The Lease Agreement Between Plaintiffs and Shell*

Plaintiffs are the owners of the premises located at 3230 Sunrise Highway, Wantagh, New York (the "Premises"). Pursuant to a lease agreement dated September 27, 1996 (the "Lease"), Plaintiffs leased the Premises to Shell for use and occupancy of a gasoline service and automobile repair station. In or about 1998, Shell assigned its rights as a tenant under the Lease to Motiva. The Lease was for a Primary Term commencing on October 1, 1996 and expiring on September 30, 2006. Pursuant to its terms, the Lease expired on September 30, 2006.

The instant dispute revolves around a provision in the Lease governing post-termination rent, to wit Article 22.C. Before addressing Article 22.C, a brief recitation of Articles 22.A and 22.B is required.

Article 22.A of the Lease, which is entitled "Contamination Indemnity," provides in pertinent part as follows:

> Subject to the conditions and limitations contained in this article, SHELL agrees to indemnify and hold [Plaintiffs] harmless from both the requirement of performing corrective action and/or the cost of performing corrective action and the cleanup of contamination, if any, of the environment and soil at the Premises and/or other property, arising from SHELL's use of the Premises and which are ordered by any federal, state or local governmental unit or agency, and for reasonable attorney fees and court costs

-2-

incurred as a result of any such contamination.

SHELL agrees to perform any such corrective action and cleanup of contamination, which is ordered by an aforementioned governmental unit or agency, when such contamination is caused by SHELL's use of the Premises. . . . This indemnity and hold harmless obligation of SHELL shall terminate on the earlier of (1) the date the applicable governmental units or agencies state that no further action is required to be taken with regard to the environmental condition of the Premises or (2) the date three (3) years after the expiration of SHELL's tenancy.

(Lease, Art. 22.A, attached as Ex. D to the Decl. of Christine D. Rivera in Supp. of Pls.' Mot.

For Partial Summ. J ("Rivera Decl.").)

Article 22.B, entitled "Testing and Corrective Action," provides, in part:

Prior to expiration of this Lease, but no earlier than 180 days before such expiration, SHELL shall test the condition of the Premises for the presence of petroleum contamination. If SHELL determines the data available indicates the presence of subsurface petroleum contamination that may require corrective action, SHELL shall take corrective action with respect to petroleum contamination caused by SHELL's use of the Premises if, and to the extent, required in a manner approved by the governmental authority exercising jurisdiction over the matter. SHELL shall complete the corrective action with respect to petroleum contamination caused by SHELL's use of the Premises, at its choice, either to: (i) the satisfaction of or acquiescence by such governmental authority or (ii) the applicable or regulatory requirements. Any corrective action performed by SHELL will be performed in accordance with applicable or regulatory requirements. SHELL may complete the corrective action before or after expiration of this LEASE. SHELL reserves its right, in its own or [Plaintiffs'] name if necessary, to challenge as unreasonable, arbitrary, or otherwise not in accordance with law, any plan of corrective action proposed by a governmental authority or any refusal by that authority to provide proof of satisfactory completion of corrective action by SHELL.

(*Id.* Art. 22.B)

As noted, the provision in dispute is found in Article 22.C, which is entitled

"Post-Termination Rent on Month-to-Month Basis Until Corrective Action is Completed."

Article 22.C provides, in pertinent part, as follows:

> In the event at the termination of this Lease there exists on or under the Premises contamination caused by SHELL's use or occupancy of the Premises for which corrective action is ordered by an applicable governmental agency, SHELL shall continue to pay rent to [Plaintiffs] on a month to month basis in the event SHELL's corrective action on the Premises in any respect substantially prevents the Premises from being used by LESSOR or another tenant. The monthly rental paid pursuant to this article shall be as follows:
>
> . . . .
>
> Additionally, SHELL shall continue to pay all real estate taxes and charges in accordance with the provisions of Article 10 of this Lease. SHELL shall continue to pay such post-termination rent and any and all real estate taxes in accordance with the provisions of this sub-Article 22.C until the first to occur of: **(1) such time as SHELL shall have obtained all applicable federal, state and local approvals regarding the satisfactory removal of SHELL caused contamination from the Premises, or (2) such time as SHELL's corrective action no longer substantially prevents the Premises from being used by [Plaintiffs] or another tenant.** In consideration for SHELL's agreement contained in this article to pay monthly rent during SHELL's substantial impairment of the Premises, [Plaintiffs] grant SHELL reasonable access to the Premises after the termination of this Lease to perform corrective action and the cleanup of the contamination. [Plaintiffs] shall be entitled to access to the Premises after termination of the Lease in order to monitor and/or perform any corrective action and clean up concerning any contamination of the Premises, if any, caused by SHELL.

(*Id.* Art 22.C (emphasis added).)

**II.**     *The Contamination on the Premises*

The following facts regarding the contamination on the Premises are taken from Defendants' submissions, the majority of which Plaintiffs deny knowledge or information sufficient to form a belief as to their truth.

According to Defendants, in June 2001, Shell voluntarily conducted environmental testing of the Premises. Laboratory results from groundwater samples identified the presence of methyl tertiary butyl ether ("MTBE") in excess of New York State Department of Environmental Conservation ("DEC") action levels. These findings were reported to the DEC and spill case number 01-03924 was opened.

Defendants promptly commenced remediation efforts, which included installation of monitoring wells, and conducted groundwater testing between August 2001 and July 2005. In December 2003, a Site Exposure Assessment ("SEA") was completed by Defendants' consultants which showed a significant decline in MTBE levels and concluded that the contamination identified in 2001 no longer posed a risk to human health or the environment.

On February 28, 2006, Defendants submitted a Site Status Update Report/Closure Request ("2006 Closure Report") to the DEC, which updated the SEA with groundwater results obtained through July 2005. This report suggested that MTBE in groundwater flowing off-site would dissipate through a process called natural attenuation without on-site remediation, and recommended closure of the Spill Case.

By letter dated June 7, 2006, Defendants forwarded 12 environmental reports prepared by Defendants' consultants to Plaintiffs' attorneys, pursuant to Plaintiffs' request, including quarterly groundwater monitoring reports.

On September 30, 2006, the Lease terminated pursuant to its terms. Thereafter, in November 2006, Defendants removed underground storage tanks and related equipment from the Premises,[1] along with 353.40 tons of impacted soil. Twenty soil samples were collected and tested for the presence of gasoline related compounds. According to one of Defendants' consultants, "the removal of the soil was a conservative measure taken by Shell out of an abundance of caution." (Decl of David Puchalski, P.E., docket no. 29(4), ¶ 7.) Of the twenty samples analyzed, all were below DEC action levels with the exception of one sample for one compound which showed a concentration of MTBE slightly above DEC standards. According to Defendants' consultants, this isolated finding was insignificant with respect to the overall condition of the Premises.

Once Defendants were done removing their tanks and equipment, they did not engage in any further activity on the Premises. By letter dated December 6, 2008, the keys were returned to Plaintiffs because the Premises had been vacated.

One of Defendants' consultants prepared a Tank Excavation Assessment and Soil Excavation Report ("TEA"), dated January 18, 2007, that detailed the work done on the Premises and environmental testing conducted in connection with the soil samples. Defendants provided Plaintiffs, as well as the DEC, with a copy of the TEA. The TEA requested that spill case number 01-03924 be closed.

On January 31, 2007, Shell and Shell's consultants met with the DEC to discuss the data contained within the TEA. During the meeting, the DEC expressed concern that excess

---

[1] Pursuant to Article 18.A of the Lease, Defendants had the right to remove from the Premises any and all underground storage tanks and other specified equipment within 60 days after termination of the Lease.

MTBE discovered in 2001 may have traveled off-site. In the absence of an identifiable source of the contamination found in 2001, the DEC requested that Shell perform additional modeling based on existing data contained within Shell's 2006 Closure Report and the TEA. Specifically, the DEC asked Shell to submit a one-dimensional transport model to demonstrate where the MTBE concentration may have traveled since it no longer remained on the Premises. The DEC did not request that additional environmental testing be conducted.

On March 2, 2007, one of Defendants' consultants submitted a Site Closure Report to the DEC that provided the requested one-dimensional model and recommended closure of the spill case number.

In early March 2007, the DEC requested that Shell submit a three-dimensional model to confirm that no MTBE concentrations had migrated off-site. The three-dimensional model findings were submitted to the DEC via an Expanded Closure Request Report ("Expanded Report") on or about June 29, 2007. The Expanded Report concluded that the MTBE detected in 2001 had dissipated through natural attenuation and did not pose a risk to human health or the environment on or off the Premises. Based on this further modeling, the Expanded Report requested closure of the spill number.

In August 2007, Defendants and their consultants engaged in two meetings with the DEC to present the findings contained within the Expanded Report and achieve case closure. On September 10, 2007, the DEC issued a No Further Action letter. The letter states that the DEC has "determined that you have completed the necessary cleanup and removal actions, and no further remedial activities are necessary." (Rivera Decl., Ex. G.)

## III.    *The North Fork Lease*

Shortly after the Lease terminated pursuant to its terms on September 30, 2006, Plaintiffs entered into a new lease of the Premises with North Fork Bank ("North Fork") pursuant to a lease agreement dated November 3, 2006 (the "North Fork Lease").  Under the North Fork Lease, North Fork agreed to occupy the Premises and construct a bank branch thereon.  The North Fork Lease requires Plaintiffs, as Lessors, within nine months of the date of execution, to:

> provide a so called "No Further Action Letter" or other evidence reasonably satisfactory to Tenant that any and all Governmental Authorities . . . including, without limitation, the New York State Department of Environmental Conservation, are satisfied that the Demised Premises is free of Hazardous Materials . . . .

(North Fork Lease ¶ 1(b), attached as Ex. F to Rivera Decl.)

According to Shell, in early 2007, Plaintiffs expressed concern that the Town of Hempstead ("Hempstead" or the "Town") might delay North Fork's redevelopment of the Premises because of the open DEC spill number.  In response, in March 2007, one of Defendants' consultants contacted Hempstead's Examiner's Office to determine the Town's requirements for redevelopment of the Premises while the spill number was still open.  The consultant was advised that a written explanation of the case status from both the DEC and Defendants' consultant, as a professional engineer, would be sufficient.

In response to Hempstead's request, Nicole Hart, the DEC geologist charged with oversight of the Premises, mailed a letter to the Town, dated March 20, 2007, with a copy to Plaintiffs, which stated in part:

> During November 2006, Motiva terminated operations at the [Premises] and subsequently removed all underground storage

tanks, dispensers and lines from the site. . . . Following removal, post excavation soil samples were obtained and a Tank Excavation Assessment report was submitted to [DEC] for [its] review.

Motiva has conducted multiple groundwater sampling events with this Department's oversight to document that monitored natural attenuation has been effective in reducing the concentration of hydrocarbons in groundwater. As part of the environmental investigation, an Exposure Assessment which evaluates possible chemical exposure pathways and the potential for chemical exposures was completed. Soil sampling indicates the soils do not create an unacceptable exposure pathway to new construction at the site. Motiva's consultants continue to work with this Department to reach case closure.

Redevelopment of the site should not be delayed due to the spill case, and redevelopment should continue following normal permit review and approval processes. . . .

(River Decl., Ex. H (the "March 20, 2007 Letter").)

On May 31, 2007, Shell's Environmental Claims Manager sent Plaintiffs a letter which "shall serve as an agreement" between Plaintiffs and Motiva. The letter provided, in part, as follows:

It is my understanding that on or about November 3, 2006, CDR, as landlord, entered into a Ground Lease Agreement with North Fork Bank, as tenant. This agreement is subject to the following condition: "within nine (9) months after the Effective Date, Landlord shall . . . provide a so-called 'No-Further Action Letter' or other evidence reasonably satisfactory to Tenant that any and all Governmental Authorities including, without limitation, [DEC], are satisfied that the Demised Premises is free of Hazardous Materials."

Motiva has been advised that redevelopment is planned for the [Premises]. It is anticipated the redevelopment activity will include a commercial bank built on a concrete slab. CDR has requested that Motiva address issues associated with the special handling of petroleum-impacted soil remaining at the [Premises] that may be encountered during construction.

> Motiva has been performing environmental assessment, remediation, and monitoring activities (the "Work") at the [Premises] under the direction and supervision of [DEC] under Spill No. 01-03924 . . . .  Motiva will continue the Work until no further activity is required by the DEC.
>
> . . . .

(*Id.* Ex. I.)

## IV.    *The Release Between Plaintiffs and Defendants*

In April 2007, Plaintiffs and Defendants entered into a Settlement Agreement and Mutual Release ("Release") wherein Plaintiff released all claims to post-termination rent for the Premises for the period October 1, 2006 through January 31, 2007, and real property taxes for October 1, 2006 through December 21, 2006 in exchange for $47,385.62.  The Release provides, inter alia, that "Motiva is working with the DEC to obtain a No Further Action letter."  (Rivera Decl., Ex. J at 1.)

## V.    *The Instant Dispute*

By instant action, Plaintiffs seek the amount of post-termination rent and real property taxes for the period February 2007 through September 2007.  Essentially, Plaintiffs argue that the Lease imposes upon Defendants the obligation not only to perform post-termination corrective actions necessary to remediate any environmental contamination caused during their tenancy, but also to pay specified amounts in rent and real estate taxes on a month-to-month basis following the termination of the Lease "in the event SHELL's corrective action on the Premises in any respect substantially prevents the Premises from being used by LESSOR or another tenant."  (Lease, Art. 22.C.)  Plaintiffs argue that the Premises were "substantially prevent[ed] . . . from being used" until September 10, 2007, i.e., the date the No Further Action

Letter was issued by the DEC. Defendants, on the other hand, contend that the Premises were able to be used pursuant to Article 22.C as of March 20, 2007, the date the DEC issued a letter of assurance to the Town that "[r]edevelopment of the [Premises] should not be delayed due to the spill case . . . ." (Rivera Decl., Ex. H.)

The Complaint asserts two causes of action. The First Cause of Action seeks post-termination rent and real property taxes for the period of February 2007 through September 2007. The Second Cause of Action seeks monetary damages arising out of Defendants' alleged unreasonable delays in performing their environmental obligations under the Lease.[2] Plaintiffs move for partial summary judgment on their First Cause of Action. Defendants move for summary judgment with respect to both the First and Second Cause of Actions. For the reasons stated below, both motions are denied.

## DISCUSSION

### I. Summary Judgment Standard

Summary judgment pursuant to Federal Rule of Civil Procedure 56 is only appropriate where admissible evidence in the form of affidavits, deposition transcripts, or other documentation demonstrates the absence of a genuine issue of material fact, and one party's entitlement to judgment as a matter of law. *See Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d 712, 716 (2d Cir. 1994). The relevant governing law in each case determines which facts are material; "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*,

---

[2] Plaintiffs' Second Cause of Action also asserted a claim for damages in the event of termination of the North Fork Lease. This claim was withdrawn by stipulation which was So Ordered by the Court on April 7, 2008.

477 U.S. 242, 248 (1986). No genuinely triable factual issue exists when the moving party demonstrates, on the basis of the pleadings and submitted evidence, and after drawing all inferences and resolving all ambiguities in favor of the non-movant, that no rational jury could find in the non-movant's favor. *Chertkova v. Conn. Gen'l Life Ins. Co.*, 92 F.3d 81, 86 (2d Cir. 1996) (citing Fed. R. Civ. P. 56(c)).

To defeat a summary judgment motion properly supported by affidavits, depositions, or other documentation, the non-movant must offer similar materials setting forth specific facts that show that there *is* a genuine issue of material fact to be tried. *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996). The non-movant must present more than a "scintilla of evidence," *Delaware & Hudson Ry. Co. v. Consolidated Rail Corp.*, 902 F.2d 174, 178 (2d Cir. 1990) (quoting *Anderson*, 477 U.S. at 252), or "some metaphysical doubt as to the material facts," *Aslanidis v. U.S. Lines, Inc.*, 7 F.3d 1067, 1072 (2d Cir. 1993) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)), and cannot rely on the allegations in his or her pleadings, conclusory statements, or on "mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. County of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citations omitted).

The district court, in considering a summary judgment motion, must also be "mindful of the underlying standards and burdens of proof," *Pickett v. RTS Helicopter*, 128 F.3d 925, 928 (5th Cir. 1997) (citing *Anderson*, 477 U.S. at 252), because the evidentiary burdens that the respective parties will bear at trial guide district courts in their determination of summary judgment motions. *Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988). Where the non-moving party will bear the ultimate burden of proof on an issue at trial, the moving party's

burden under Rule 56 will be satisfied if he can point to an absence of evidence to support an essential element of the non-movant's claim. *Id.* at 210-11. Where a movant without the underlying burden of proof offers evidence that the non-movant has failed to establish her claim, the burden shifts to the non-movant to offer "persuasive evidence that [her] claim is not 'implausible.'" *Brady*, 863 F.2d at 211 (citing *Matsushita*, 475 U.S. at 587).

**II.    Plaintiffs' and Defendants' Motions For Summary
Judgment With Regard to the First Cause of Action are Denied**

**A.    Contract Interpretation**

The threshold issue in this case is whether the relevant provision of the Lease is ambiguous, which is a question of law. *Chapman v. N.Y. State Div. for Youth*, 546 F.3d 230, 236 (2d Cir. 2008). "Under New York law, the presence or absence of ambiguity is determined by looking within the four corners of the document, without reference to extrinsic evidence." *Id.* "[A]n ambiguity exists where a contract term could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Id.* (citation and internal quotation marks omitted); *see also Photopaint Techs., LLC v. Smartlens Corp.*, 335 F.3d 152, 160 (2d Cir. 2003) ("Contract language is unambiguous when it has a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion.") (citations and internal quotations marks omitted). "Unambiguous contract language is not rendered ambiguous by competing interpretations of it urged in litigation." *Photopaint Techs.*, 335 F.3d at 160 (citations omitted). If the Court determines that the contract is "wholly unambiguous and . . . convey[s] a definite

meaning," summary judgment may be granted. *See Topps Co. v. Cadbury Stani S.A.I.C.*, 526 F.3d 63, 68 (2d Cir. 2008).

If the Court finds that the contract is ambiguous, its interpretation becomes a question of fact and summary judgment is generally not appropriate. *See Mellon Bank, N.A. v. United Bank Corp. of N.Y.*, 31 F.3d 113, 116 (2d Cir. 1994). Notwithstanding this general rule, the Court may resolve the ambiguity as a matter of law "if there is no extrinsic evidence to support one party's interpretation of the ambiguous language or if the extrinsic evidence is so one-sided that no reasonable factfinder could decide contrary to one party's interpretation." *Compagnie Financiere de CIC et de L'Union Europeenne v. Merril Lynch, Pierce, Fenner & Smith Inc.*, 232 F.3d 153, 159 (2d Cir. 2000).

**B.      *The Clause at Issue***

The clause in dispute is found in Article 22.C of the Lease and is repeated below:

> In the event at the termination of this Lease there exists on or under the Premises contamination caused by SHELL's use or occupancy of the Premises for which corrective action is ordered by an applicable governmental agency, SHELL shall continue to pay rent to [Plaintiffs] on a month to month basis in the event SHELL's corrective action on the Premises in any respect **substantially prevents the Premises from being used by LESSOR or another tenant**.
>
> . . . .
>
> Additionally, SHELL shall continue to pay all real estate taxes and charges in accordance with the provisions of Article 10 of this Lease. SHELL shall continue to pay such post-termination rent and any and all real estate taxes in accordance with the provisions of this sub-Article 22.C until the first to occur of: **(1) such time as SHELL shall have obtained all applicable federal, state and local approvals regarding the satisfactory removal of SHELL caused contamination from the Premises, or (2) such time as SHELL's corrective action no longer substantially prevents the**

**Premises from being used by [Plaintiffs] or another tenant**. . . .

(Lease, Art 22.C (emphasis added).)

Each party claims that the plain language of the above-cited provision unambiguously supports its interpretation. In reviewing two interpretations, the Court "need not determine which is the more likely interpretation; [the Court] need merely decide whether each . . . is sufficiently reasonable to render the clause ambiguous." *Mellon Bank*, 31 F.3d at 115 (citation, alteration, and internal quotation marks omitted). The Court examines the parties' positions below.

## C.    *Defendants' Interpretation*

As noted, Defendants' obligation to pay post-termination rent and real estate taxes under the Lease accrues:

> until the first to occur of: (1) such time as SHELL shall have obtained all applicable federal, state and local approvals regarding the satisfactory removal of SHELL caused contamination from the Premises, or (2) such time as SHELL's corrective action no longer substantially prevents the Premises from being used by [Plaintiffs] or another tenant.

(Lease, Art. 23.C.) Defendants argue that the issuance of a No Further Action letter falls within the first contingency, to wit, state approval regarding removal of contamination. Defendants submit that Plaintiffs' interpretation that the obligation to pay extends until issuance of a No Further Action letter "improperly negates the alternative provided [via subdivision (1)] and [thus] defeats the intent of the provision." (Mem. of Law in Supp. of Defs.' Mot. at 10.)

With regard to the second alternative, viz. "such time as SHELL's corrective action no longer substantially prevents the Premises from being used by [Plaintiffs] or another tenant," Defendants argue that since they did not engage in any *on-site* corrective action after

-15-

November 2006 – when they removed their underground storage tanks together with over 350 tons of impacted soil – there was no corrective action taken on their behalf which "substantially prevent[ed] the Premises from being used." Defendants attempt to bolster this argument by noting that following submission of the TEA in January 2007, all DEC inquiries and requests involved additional scientific modeling of *existing data*, and no further samples of either groundwater or soil was requested. Defendants argue that this scientific modeling is not "corrective action" which according to them is "an activity on the property that can impose significant interference with use of land," including soil vapor extraction and groundwater pump and treat remediation treatments. (Mem. of Law in Supp. of Defs.' Mot. at 10.) Defendants further explain:

> If there was no need for additional testing, DEC must have been satisfied with the laboratory results and no longer concerned that the Premises were contaminated. . . . Discussions with DEC and the additional paperwork generated had no bearing on "use" of the Premises, and did not "substantially prevent" the Premises from being used. . . .

(Mem. of Law in Supp. of Defs.' Mot. at 12.)

Finally, Defendants point to the March 20, 2007 Letter which they contend "fully supports Defendants' contention that DEC no longer believed that 'corrective action' was warranted." (*Id.* at 12.) As noted, this letter, written by the DEC, provides that "the soils do not create an unacceptable exposure pathway to new construction at the site" and that "[r]edevelopment of the site should not be delayed due to the spill case, and redevelopment should continue following normal permit review and approval processes." (Rivera Decl., Ex. H.) Defendants argue that this letter demonstrates, as a matter of law, that no further corrective action was required that would have "substantially prevent[ed]" another tenant from using the

Premises.

**D.** *Plaintiffs' Interpretation*

Plaintiffs argue that the Premises were "substantially prevent[ed] . . . from being used by [Plaintiffs] or another tenant" until such time as the spill case proceeding was officially closed by the DEC via issuance of a No Further Action letter. Plaintiffs argue that the March 20, 2007 Letter fails, as a matter of law, to constitute reasonably satisfactory evidence of the DEC's satisfaction that the Premises were free of hazardous materials such that the impediment to the use of the Premises caused by the spill was vitiated. Although the DEC in its March 20, 2007 Letter states that "[r]edevelopment of the [Premises] should not be delayed due to the spill case," Plaintiffs point to the fact that the March 20, 2007 Letter also indicates that "Motiva's consultants continue to work with th[e DEC] to reach case closure." (Rivera Decl., Ex. H.) Plaintiffs contend that such ongoing corrective action "substantially prevent[ed]" the use of the Premises by Plaintiffs and/or its new tenant as a matter of law.

In this regard, Plaintiffs reject Defendants' construction of Article 22.C as applying only to the extent *on-site* corrective action was required. They point to that part of Article 22.C which provides that "SHELL shall continue to pay rent to [Plaintiffs] on a month to month basis in the event SHELL's corrective action on the Premises *in any respect* substantially prevents the Premises from being used by LESSOR or another tenant." (Lease, Art. 22.C (emphasis added).) Thus, Plaintiffs argue that Defendants' obligations under the Lease did not terminate merely upon the DEC's suggestion that redevelopment should not be delayed, but continued during all times when corrective action related to the spill proceeding substantially prevented use of the Premises "in any respect."

Plaintiffs also rely on Art 22.B of the Lease wherein Shell expressly reserved the right "to challenge as unreasonable, arbitrary, or otherwise not in accordance with law, . . . any refusal by that authority to provide proof of satisfactory completion of corrective action by S[hell]." (Lease Art 22.B.) Plaintiff maintains that this provision would be rendered meaningless if the termination of Shell/Motiva's obligations under the Lease were not inextricably tied to their procurement of "proof of satisfactory completion of corrective action."

Finally, Plaintiffs point out that the North Fork Lease explicitly provides that North Fork, Plaintiffs' subsequent tenant, is not obliged to occupy the Premises until the DEC issues a No Further Action Letter, which was not issued until September 10, 2007. Thus, Plaintiffs argue that North Fork was in actuality "substantially prevented" from using the Premises pending the DEC spill proceedings until a No Further Action letter was issued.[3]

E.      *The Court Finds that the Contract is Ambiguous*

After reviewing the Lease as well as the parties' respective positions, the Court concludes that the parties each offer conflicting yet reasonable interpretations of the relevant provision. Defendants maintain that the Premises were usable by March 20, 2007, when the DEC indicated that redevelopment should not be delayed and all on-site corrective action had

_____

[3] Plaintiffs also argue that although the DEC may not have objected to "new construction at the site," the March 20, 2007 Letter does not purport to protect any tenant, including North Fork, from direct and strict liability under N.Y. Navigation Law § 181(1). This section provides that "[a]ny person who has discharged petroleum shall be strictly liable, without regard to fault, for all cleanup and removal costs and all direct and indirect damages, no matter by whom sustained . . . ." N.Y. Navigation Law § 181(1). While Plaintiffs are correct that courts have broadly interpreted the Navigation Law's "discharger liability" to include anyone in a position to "effect an immediate cleanup," *see State of N.Y. v. Montayne*, 604 N.Y.S.2d 978, 979 (3d Dep't 1993), Plaintiffs have pointed to no cases holding subsequent tenants liable under this statute. Accordingly, the Court declines to consider Plaintiff's arguments under the Navigation Law at this time.

long since terminated.  Plaintiffs counter that use of the Premises was "substantially prevent[ed]" until such time as the DEC issued a No Further Action letter.  A recent case by the Third Circuit, *Jaasma v. Shell Oil Co,*, 412 F.3d 501 (3d Cir. 2005), is instructive.

In *Jaasma*, the plaintiff property owner sued Shell and Motiva for breach of their lease.  The lease in that case provided that Shell "shall comply with all applicable environmental laws" and that Shell shall "restore[]" the premises "to its original state."  *Id.* at 504.  During the tenancy, the subject premises were contaminated by petroleum discharges prompting the New Jersey Department of Environmental Protection ("NJDEP") to commence an investigation and related proceedings.  Although the lease was scheduled to terminate on October 31, 2001, a No Further Action letter was not issued until February 18, 2004.

Plaintiff claimed that Shell and Motiva's failure to procure a No Further Action letter rendered the property unmarketable and constituted a breach of their contractual duty to return the property to its "original state."  Shell and Motiva argued that soil and water samples had consistently demonstrated that the property was environmentally safe during the period of NJDEP oversight following the termination of the lease and that from October 2001 to February 18, 2004, the NJDEP only requested additional confirmatory samples but no further remediation measures were taken or required.  *Id.* at 505.

In finding that Shell and Motiva were not entitled to judgment dismissing plaintiff's breach of lease claim, the Third Circuit stated as follows:

> We need not decide, as an abstract proposition, whether a[ No
> Further Action letter] per se is required; we do however believe
> that a reasonable fact finder could determine that the duty to return
> the property to its "original state" encompasses the duty to leave
> the property free from the kind of impediments that would render it
> unmarketable. . . . [W] e believe that a factfinder could reasonably

-19-

find that the property was not fully marketable prior to the issuance of the [No Further Action] letter.

. . . .

In sum, given the varying interpretations offered by Jaasma and defendants of the contractual language, we cannot say that the lease is "wholly unambiguous" as to defendants' contractual duties. . . .

*Id.* at 508-09.

Here, as in *Jaasma*, reasonable minds could disagree as to the meaning of the Lease provision. Although the language in dispute in the instant matter ("substantially prevents the Premises from being used") differs from the provision at issue in *Jaasma* ("the Premises restored to its original state"), the court's rationale is nevertheless instructive. A rational juror could find that until the spill proceeding was officially closed via a No Further Action letter, Plaintiffs would be unable to use or rent the Premises due to the uncertainty surrounding its environmental status. On the other hand, a reasonable factfinder could find that the Premises were usable as of March 20, 2007, the date the DEC stated that redevelopment of the DEC should not be delayed due to the spill case as "the soils do not create an unacceptable exposure pathway to new construction." (Rivera Decl., Ex. H.) Accordingly, the Court finds that the Lease is ambiguous and both parties' motions for summary judgment on the First Cause of Action are denied.[4]

---

[4] In reaching this conclusion, the Court did not consider the fact that the North Fork Lease explicitly provides that North Fork is not obliged to occupy the Premises until issuance of a No Further Action letter, as the North Fork Lease is extrinsic to the provision at issue. *See Chapman*, 546 F.3d at 236 (noting that issue of contractual ambiguity is determined "without reference to extrinsic evidence"). Although the Court may resolve an ambiguity in a contract as a matter of law if the extrinsic evidence overwhelmingly supports one party's position, *see Compagnie Financiere*, 232 F.3d at 159, that is not the case here. Because North Fork is merely

**III.**    *Defendants' Motion for Summary Judgment*
              *With Regard to the Second Cause of Action is Denied*

The Second Cause of Action alleges that due to Defendants' "failure to timely perform environmental testing of the Premises within 180 days prior to the expiration of the term of the Lease, and by reason of delays until September 10, 2007 in obtaining the [No Further Action] letter, plaintiffs have been unable to provide possession of the Premises to [North Fork] pursuant to the [North Fork] Lease."  (Compl. ¶ 22.)  Plaintiffs seek damages caused by the delay in commencing the North Fork Lease.

In Defendants' memorandum of law in support of their motion for summary judgment with regard to the Second Cause of Action, Defendants state in one paragraph, absent any citations to case law or the record, that the Second Cause of Action has no basis in law or fact because Plaintiffs base this claim on provisions contained in the North Fork Lease, to which Defendants were not a party.  (Mem. of Law in Supp. of Defs.' Mot. at 14.)  In response, Plaintiffs state that they never attempted to impose their obligations under the North Fork Lease on Defendants and that, instead, their Second Cause of Action seeks damages incurred by virtue of Defendants' alleged willful breach of their express obligations under their Lease with Plaintiffs.  As a direct consequence of Defendants' breach, Plaintiffs allege that they were deprived of the fair rental value of the Premises from January 31, 2007 (when Defendants last paid post-termination rent and taxes) until January 1, 2008 (when North Fork took possession of the Premises), which includes leasehold improvements due to be made by North Fork.

In their reply papers, Defendants for the first time proffer that North Fork's delay

---

one tenant, its lease is not dispositive on the issue of whether the Premises were "substantially prevent[ed] . . .  from being used by [Plaintiffs] or another tenant."

in accepting delivery of the Premises has nothing to do with the timing of the No Action Letter, but rather North Fork's independent discovery of asbestos on the premises by its consulting engineer, George Kan, two weeks after the No Further Action letter was issued. In support of this claim, Defendants submit four brief documents: (1) an internal North Fork e-mail dated September 13, 2007 acknowledging receipt of the No Further Action letter and advising that the due diligence period under the North Fork Lease commences upon Plaintiffs meeting specified lease requirements, including the removal of all hazardous materials from the Premises; (2) George Kan's September 24, 2007 Asbestos Investigation Report; (3) an internal North Fork e-mail indicating that Plaintiffs were hiring a contractor to perform asbestos abatement which should be done within the next two weeks; and (4) a letter dated October 19, 2007 indicating that Plaintiffs' asbestos abatement was completed. (*See* Decl. of William A. Ruskin, docket no. 33.) Defendants submit that Plaintiffs' failure to remedy the asbestos problem pursuant to the North Fork Lease was "the sole proximate cause of the delay" in providing North Fork possession of the Premises. (Defs.' Reply Mem. at 6.)

      The Court finds that Defendants' evidence, proffered for the first time in their reply papers, is insufficient to demonstrate their entitlement to judgment as a matter of law. Prescinding from the fact that Plaintiffs have not had an opportunity to refute Defendants' claims, Defendants' evidence spans from September 2007 through October 19, 2007. Yet Plaintiffs seek damages for the delay from January 31, 2007 (when Defendants last paid post-termination rent and taxes) until January 1, 2008 (when North Fork took possession of the Premises). Moreover, it is undisputed that the spill proceeding remained open until September 2007. Accordingly, based on the present record, Defendants' motion for summary judgment as

to the Second Cause of Action is denied.

## *CONCLUSION*

For all of the above reasons, Plaintiffs' motion for partial summary judgment, and

Defendants' motion for summary judgment, are both DENIED.

**SO ORDERED.**

Dated: Central Islip, New York
     March 31, 2009                       /s_____
                                            Denis R. Hurley,
                                            United States District Judge