UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
CDR-Wantagh, Inc. and Christine D. Rivera,
individually and as Trustee for the benefit
of JAMES DELYANIS,

                Plaintiffs,               **MEMORANDUM AND ORDER**
                                       07-CV-4497 (DRH) (ETB)

       - against -

SHELL OIL COMPANY and MOTIVA
ENTERPRISES LLC,

                Defendants.
------------------------------------------------------------X

**A P P E A R A N C E S :**

**ROSENBERG CALICA & BIRNEY LLP,**
Attorneys for Plaintiffs
100 Garden City Plaza
Suite 408
Garden City, New York 11530
By: Robert M. Calica, Esq.
    Megan F. Carroll, Esq.

**EPSTEIN BECKER & GREEN P.C.**
Attorneys for Defendants
250 Park Avenue
New York, New York 10177-1121
By: William A. Ruskin, Esq.
    Victoria Sloan, Esq.

**HURLEY, Senior District Judge:**

      This action arises out of the interpretation of a lease provision governing payment of

post-termination rent and property taxes.  Defendants Shell Oil Company ("Shell") and Motiva

Enterprises LLC ("Motiva") (collectively, "Defendants") move, pursuant to Rule 702 of the

Federal Rules of Evidence, for an order disqualifying Herbert Balin, Esq. as an expert witness

and precluding him from testifying at trial on behalf of Plaintiffs CDR-Wantagh Inc. ("CDR")

and Christine D. Rivera, individually and as Trustee for the benefit of James Delyanis (collectively, "Plaintiffs").  For the reasons set forth below, Defendants' motion is DENIED.

## *BACKGROUND*[1]

### I.      *The Lease Agreement Between Plaintiffs and Shell*

Plaintiffs are the owners of the premises located at 3230 Sunrise Highway, Wantagh, New York (the "Premises").  Pursuant to a lease agreement dated September 27, 1996 (the "Lease"), Plaintiffs leased the Premises to Shell for use and occupancy of a gasoline service and automobile repair station.  In or about 1998, Shell assigned its rights as a tenant under the Lease to Motiva.  The Lease was for a Primary Term commencing on October 1, 1996 and expiring on September 30, 2006.

The instant dispute revolves around a provision in the Lease governing post-termination rent, to wit Article 22.C.  Before addressing Article 22.C, a brief recitation of Articles 22.A and 22.B is required.

Article 22.A of the Lease, which is entitled "Contamination Indemnity," provides in pertinent part as follows:

> Subject to the conditions and limitations contained in this article, SHELL agrees to indemnify and hold [Plaintiffs] harmless from both the requirement of performing corrective action and/or the cost of performing corrective action and the cleanup of contamination, if any, of the environment and soil at the Premises and/or other property, arising from SHELL's use of the Premises and which are ordered by any federal, state or local governmental unit or agency, and for reasonable attorney fees and court costs

---

[1]      Unless otherwise noted, the facts set forth herein are taken from this Court's March 31, 2009 Memorandum and Order ("March 31 Order") denying both parties' motions for summary judgement.  The facts set forth in the March 31 Order were drawn from the Complaint and the parties' Local 56.1 Statements, and were undisputed unless otherwise noted.

incurred as a result of any such contamination.

SHELL agrees to perform any such corrective action and cleanup of contamination, which is ordered by an aforementioned governmental unit or agency, when such contamination is caused by SHELL's use of the Premises. . . .  This indemnity and hold harmless obligation of SHELL shall terminate on the earlier of (1) the date the applicable governmental units or agencies state that no further action is required to be taken with regard to the environmental condition of the Premises or (2) the date three (3) years after the expiration of SHELL's tenancy.

(March 31 Order at 2-3.)

Article 22.B, entitled "Testing and Corrective Action," provides, in part:

Prior to expiration of this Lease, but no earlier than 180 days before such expiration, SHELL shall test the condition of the Premises for the presence of petroleum contamination.  If SHELL determines the data available indicates the presence of subsurface petroleum contamination that may require corrective action, SHELL shall take corrective action with respect to petroleum contamination caused by SHELL's use of the Premises if, and to the extent, required in a manner approved by the governmental authority exercising jurisdiction over the matter.  SHELL shall complete the corrective action with respect to petroleum contamination caused by SHELL's use of the Premises, at its choice, either to: (I) the satisfaction of or acquiescence by such governmental authority or (ii) the applicable or regulatory requirements.  Any corrective action performed by SHELL will be performed in accordance with applicable or regulatory requirements.  SHELL may complete the corrective action before or after expiration of this LEASE.  SHELL reserves its right, in its own or [Plaintiffs'] name if necessary, to challenge as unreasonable, arbitrary, or otherwise not in accordance with law, any plan of corrective action proposed by a governmental authority or any refusal by that authority to provide proof of satisfactory completion of corrective action by SHELL.

(*Id.* at 3.)

As noted, the provision in dispute is found in Article 22.C, which is entitled "Post-

Termination Rent on Month-to-Month Basis Until Corrective Action is Completed."  Article

22.C provides, in pertinent part, as follows:

> In the event at the termination of this Lease there exists on or under the Premises contamination caused by SHELL's use or occupancy of the Premises for which corrective action is ordered by an applicable governmental agency, SHELL shall continue to pay rent to [Plaintiffs] on a month to month basis in the event SHELL's corrective action on the Premises in any respect substantially prevents the Premises from being used by LESSOR or another tenant. The monthly rental paid pursuant to this article shall be as follows:
>
> . . . .
>
> Additionally, SHELL shall continue to pay all real estate taxes and charges in accordance with the provisions of Article 10 of this Lease. SHELL shall continue to pay such post-termination rent and any and all real estate taxes in accordance with the provisions of this sub-Article 22.C until the first to occur of: **(1) such time as SHELL shall have obtained all applicable federal, state and local approvals regarding the satisfactory removal of SHELL caused contamination from the Premises, or (2) such time as SHELL's corrective action no longer substantially prevents the Premises from being used by [Plaintiffs] or another tenant.** In consideration for SHELL's agreement contained in this article to pay monthly rent during SHELL's substantial impairment of the Premises, [Plaintiffs] grant SHELL reasonable access to the Premises after the termination of this Lease to perform corrective action and the cleanup of the contamination. [Plaintiffs] shall be entitled to access to the Premises after termination of the Lease in order to monitor and/or perform any corrective action and clean up concerning any contamination of the Premises, if any, caused by SHELL.

(*Id.* at 4.)

## II.     *The Contamination on the Premises*

According to Defendants, in June 2001, Shell voluntarily conducted environmental testing of the Premises. Laboratory results from groundwater samples identified the presence of methyl tertiary butyl ether ("MTBE") in excess of New York State Department of Environmental

Conservation ("DEC") action levels. These findings were reported to the DEC and spill case number 01-03924 was opened. Defendants promptly commenced remediation efforts, which included installation of monitoring wells, and conducted groundwater testing between August 2001 and July 2005.

On September 30, 2006, the Lease terminated pursuant to its terms. Thereafter, in November 2006, Defendants removed underground storage tanks and related equipment from the Premises, along with 353.40 tons of impacted soil. Defendants did not engage in any further activity on the Premises. By letter dated December 6, 2008, the keys were returned to Plaintiffs because the Premises had been vacated.

One of Defendants' consultants prepared a Tank Excavation Assessment and Soil Excavation Report ("TEA"), dated January 18, 2007, that detailed the work done on the Premises and environmental testing conducted in connection with the soil samples. Defendants provided Plaintiffs, as well as the DEC, with a copy of the TEA. The TEA requested that spill case number 01-03924 be closed.

On January 31, 2007, Shell and Shell's consultants met with the DEC to discuss the data contained within the TEA. During the meeting, the DEC expressed concern that excess MTBE discovered in 2001 may have traveled off-site. In the absence of an identifiable source of the contamination found in 2001, the DEC requested that Shell perform additional modeling based on existing data contained within Shell's 2006 Closure Report and the TEA. Specifically, the DEC asked Shell to submit a one-dimensional transport model to demonstrate where the MTBE concentration may have traveled since it no longer remained on the Premises, which Defendants did on March 2, 2007.

In early March 2007, the DEC requested that Shell submit a three-dimensional model to confirm that no MTBE concentrations had migrated off-site, which Shell did on or about June 29, 2007.

## III. *The North Fork Lease*

Shortly after the Lease terminated pursuant to its terms on September 30, 2006, Plaintiffs entered into a new lease of the Premises with North Fork Bank ("North Fork") pursuant to a lease agreement dated November 3, 2006 (the "North Fork Lease"). Under the North Fork Lease, North Fork agreed to occupy the Premises and construct a bank branch thereon. The North Fork Lease requires Plaintiffs, as Lessors, within nine months of the date of execution, to:

> provide a so called "No Further Action Letter" or other evidence
> reasonably satisfactory to Tenant that any and all Governmental
> Authorities . . . including, without limitation, the New York State
> Department of Environmental Conservation, are satisfied that the
> Demised Premises is free of Hazardous Materials . . . .

(March 31 Order at 8.)

In March 2007, one of Defendants' consultants contacted Town of Hempstead's Examiner's Office to determine the Town's requirements for redevelopment of the Premises while the spill number was still open. The consultant was advised that a written explanation of the case status from both the DEC and Defendants' consultant, as a professional engineer, would be sufficient.

In response to Hempstead's request, Nicole Hart, the DEC geologist charged with oversight of the Premises, mailed a letter to the Town, dated March 20, 2007, with a copy to Plaintiffs, which stated in part:

> Motiva has conducted multiple groundwater sampling events with

this Department's oversight to document that monitored natural attenuation has been effective in reducing the concentration of hydrocarbons in groundwater. As part of the environmental investigation, an Exposure Assessment which evaluates possible chemical exposure pathways and the potential for chemical exposures was completed. Soil sampling indicates the soils do not create an unacceptable exposure pathway to new construction at the site. Motiva's consultants continue to work with this Department to reach case closure.

Redevelopment of the site should not be delayed due to the spill case, and redevelopment should continue following normal permit review and approval processes. . . .

(*Id.* at 9.)

IV.    ***The No Further Action Letter***

On September 10, 2007, the DEC issued a No Further Action letter. The letter states that the DEC has "determined that you have completed the necessary cleanup and removal actions, and no further remedial activities are necessary." (*Id.* at 7.)

V.    ***The Instant Action***

Plaintiffs seek the amount of post-termination rent and real property taxes for the period February 2007 through September 2007. Plaintiffs argue that the Premises were "substantially prevent[ed] . . . from being used" until September 10, 2007, i.e., the date the No Further Action Letter was issued by the DEC. Defendants, on the other hand, contend that the Premises were able to be used pursuant to Article 22.C as of March 20, 2007, the date the DEC issued a letter of assurance to the Town that "[r]edevelopment of the [Premises] should not be delayed due to the spill case . . . ." (*Id.* at 10-11.)

By Order dated March 31, 2009, this Court denied both parties' motions for summary judgment. The Court found that "reasonable minds could disagree as to the meaning" of Article

22.C:

> A rational juror could find that until the spill proceeding was officially closed via a No Further Action letter, Plaintiffs would be unable to use or rent the Premises due to the uncertainty surrounding its environmental status. On the other hand, a reasonable factfinder could find that the Premises were usable as of March 20, 2007, the date the DEC stated that redevelopment of the DEC should not be delayed due to the spill case as "the soils do not create an unacceptable exposure pathway to new construction." (Rivera Decl., Ex. H.) Accordingly, the Court finds that the Lease is ambiguous and both parties' motions for summary judgment on the First Cause of Action are denied.

(*Id.* at 20.)

## VI. *The Expert Report*

Plaintiffs retained Mr. Balin as an expert and requested that he "provide a Report and express an opinion as to whether the continued pendency of the Spill Proceeding after the termination of the term of the Lease effective on September 30, 2006, and until the issuance of the *'No Further Action'* letter by the DEC on September 10, 2007, constituted *'corrective action [which] substantially prevents the Premises from being used by Lessor or another Tenant.'*" (Ruskin Aff., Ex. C at 5.) In an August 28, 2009 document entitled Rule 26(a)(2) Disclosure and Expert Report (the "Expert Report"), Mr. Balin opined that "the continued, open and pending status of the DEC's Spill Proceeding until the '*No Further Action*' letter was issued on September 10, 2007 constituted '*corrective action [which] substantially prevents the Premises from being used by Lessor and other Tenant.*'" (*Id.*)

Mr. Balin relied, in part, on the transcript of the July 2009 deposition of DEC geologist Nicole Hart and summarized her deposition testimony as follows:

> [T]he DEC had not yet reached a determination as to whether any

> contamination from the Spill emanating from the Premises had migrated offsite until August 2007, shortly prior to the issuance of the "*No Further Action*" letter on September 10, 2007. (Hart Dep. Tr., pp 67-69). Until such time that such a determination was made by the DEC, according to Ms. Hart, the DEC was requiring Shell to continue to perform various additional tests and computer modeling in order to ascertain whether or not contamination from the Spill had migrated offsite such that additional remediation might be required to be performed by Shell either on site, or offsite, but more likely, on site. (Hart Dep. Tr., pp 38-39).

(*Id.* at 6.) Mr. Balin opined that "[t]here was a substantial risk that in the event further onsite remediation" was required by the DEC, it "might" involve "the installation of remediation devices such as an air stripper, monitoring wells, and other devices and installation on the Premises." (*Id.*) According to Mr. Balin, "[t]he installation and operation of such devices, if required by the DEC would have substantially interfered with the redevelopment of the Premises by the Lessor or a new Tenant." (*Id.*)

Mr. Balin noted that the "North Fork Bank lease was made contingent upon the issuance of a '*No Further Action*' letter by the DEC" and opined that "construction of a new bank building by North Fork or the redevelopment of the Premises by any other successor Tenant . . . was adversely impacted and therefore[ ] 'substantially prevented' as a result of the unconcluded Spill Proceeding prior to the issuance by the DEC of the '*No Further Action*' letter." (*Id.* at 6-7.) Mr. Balin stated that "[b]ased on my professional experience, a reasonable commercial Tenant of the Premises in Nassau County in the years 2006-2007 would not agree to lease, occupy, redevelop" or possess the Premises, or pay rent or taxes under any lease for the Premises, "prior to the issuance of a '*No Further Action*' letter by the DEC." (*Id.* at 7.) According to Mr. Balin, the provision in the North Fork Lease making the deal "contingent upon the issuance of a '*No

*Further Action Letter*' is in my opinion, typical of what a reasonable tenant would require." (*Id.*)

Mr. Balin further opined that "a reasonably competent and skilled attorney practicing in the New York Metropolitan area during the periods in issue would advise a client . . . not to enter into a Lease . . . or to redevelop . . . the Premises prior to the issuance of a '*No Further Action*' letter," and "[i]n my prior experience as a real estate, land use and zoning attorney," Mr. Balin would have provided the same advice to "any client contemplating entering into a Lease to occupy the Premises." (*Id.*)

**VII.    *Mr. Balin's Qualifications***

According to Mr. Balin's attached curriculum vitae, he is a senior partner at the law firm of Certilman Balin Adler & Hyman, LLP and has practiced law for more than fifty years. (*Id.*, Ex. A at 1.) Mr. Balin has extensive experience serving as real estate and zoning counsel for entities located on Long Island and "was the zoning counsel principally responsible for the introduction of 'cluster zoning' on Long Island in the 1970's." (*Id.* at 8-9.)

## DISCUSSION

**I.    *Mr. Balin "Prepared" The Expert Report in Compliance With Fed. R. Civ. P. 26***

Defendants contend initially that "Mr. Balin failed to 'prepare' his expert report as required by [Rule 26] and he should not be permitted to testify at trial. (Defs.' Mem. at 9.) As support for this argument, Defendants cite to the following deposition testimony of Mr. Balin:

> Q:    Did you prepare any of the narrative contained in the disclosure?
>
> A:    I believe I changed a couple of sentences, but I did not prepare it.
>
> Q:    Do you know who did?

A:    Best of my knowledge, Mr. Calica [Plaintiffs' counsel].
      We talked about it a few times.

(*Id.* at 9 (citing Balin Dep. at 6).)[2]

Plaintiffs assert that Defendants have "mischaracterized" Mr. Balin's deposition testimony by omitting his subsequent statements that his Expert Report contains his "expert opinions" in this case, and that he had not "delegated to any other person any portion of [his] role in providing expert opinions." (Pls.'s Opp'n at 6; Balin Dep. at 6-7.) Mr. Balin states in his declaration that during his deposition he understood Defendants' counsel "to be inquiring as to whether I had physically typed the document (which I had not), as opposed to whether I had formulated and prepared the <u>opinions</u> contained therein (which I had)." (Decl. of Herbert M. Balin, Esq., dated June 3, 2010 ("Balin Decl.") at ¶ 7.) Plaintiffs also argue that "it was necessary and appropriate for counsel to assist Mr. Balin in the preparation of his report" because, as Mr. Balin testified during his deposition, he has not litigated a case in over twenty years and has never served as an expert witness. (Pls.' Opp'n at 8; Balin Dep. at 12, 43.)

Rule 26(a)(2)(B) requires that a party's expert witness disclosures "must be accompanied by a written report – prepared and signed by the witness – if the witness is one retained or specially employed to provide expert testimony in the case." Fed. R. Civ. P. 26(a)(2)(B). The 1993 Advisory Committee Note to Rule 26(a)(2)(B) provides as follows:

> Rule 26(a)(2)(B) does not preclude counsel from providing assistance to experts in preparing the reports, and indeed, with experts such as automobile mechanics, this assistance may be needed. Nevertheless, the report, which is intended to set forth the substance of the direct examination, should be written in a manner that reflects the testimony

---

[2]    "Balin Dep." refers to the transcript from the September 22, 2009 deposition of Herbert Balin, Esq., which is attached to the Ruskin Affidavit as Exhibit D.

to be given by the witness and it must be signed by the witness.

Fed. R. Civ. P. 26 advisory committee's note. The general consensus among district courts within this Circuit is that "attorneys are not precluded from assisting expert witnesses in the preparation of their reports so long as the witness remains substantially involved." *See e.g., Rouson v. Eicoff*, 2007 WL 1827422, at *8 (E.D.N.Y. June 25, 2007) (quoting *Keystone Mfg. Co., Inc. v. Jaccard Corp.*, 394 F. Supp. 2d 543, 568 (W.D.N.Y. 2005)) (internal quotation marks omitted); *see also Lab Crafters, Inc. v. Flow Safe, Inc.*, 2007 WL 7034303, at *5 (E.D.N.Y. Oct. 26, 2007) (same).

In his declaration, Mr. Balin states that Plaintiffs' counsel instructed him that he "would be solely responsible for preparing and formulating all aspects of the expert report which contain my expert opinion." (Balin Decl. ¶ 8.) Accordingly, Balin "diligently reviewed the material designated in the report, and engaged in several lengthy conversations with Mr. Calica during which I fully communicated my expert opinions with respect to each of the issues contained in the Balin Report." (*Id.*) Then, "Mr. Calica arranged to have these oral communications transcribed into the written report." (*Id.*) Balin stated under oath, both during his deposition and in his declaration, that the opinions contained in the Expert Report are his alone. (*See* Balin Decl. ¶ 10; Balin Dep. at 6-7.) Moreover, the document in question explicitly states on its face that it was "prepared and signed by Mr. Balin and transcribed by counsel based on information supplied by Mr. Balin." (Ruskin Aff., Ex. C at 1 n.1.) Finally, Mr. Balin stated that because he is an attorney who had not litigated a case in twenty years and is a "first time expert," he required the assistance of counsel in preparing the Expert Report in compliance "with the strict expert disclosure requirements set forth in the Federal Rules." (Balin Decl. ¶ 9.)

Given these facts, the Court finds that Plaintiffs have proffered sufficient evidence demonstrating that the Expert Report accurately reflects Mr. Balin's opinions and that any assistance from Plaintiffs' counsel in preparing the Expert Report does not warrant striking it from the record. *Compare Lab Crafters, Inc.*, 2007 WL 7034303 at **5-6 (refusing to strike expert report when expert never denied that he was aided by counsel in preparing the report, the expert reviewed a variety of documents in reaching the opinions contained in the report, and counsel's assistance in preparing the report was necessary due to time constraints), *and Keystone Mfg. Co., Inc.*, 394 F. Supp. 2d at 568 (declining to strike expert report when expert admitted that counsel assisted him in preparing the report but stated that he "was actively and substantively involved in the preparation and content of the report," thoroughly read the report before signing it, and confirmed the opinions set forth therein were his own), *with Rouson*, 2007 WL 1827422 at *9 (striking expert report when expert "neither prepared the expert report himself nor was 'substantially involved' in the report's preparation").

Accordingly, the Court declines to exclude the Expert Report on this ground. The participation of counsel in the preparation of the Expert Report, "depending on the circumstances, may properly be considered by the trier of the facts on the issue of the weight, if any, to be given to such evidence." *Lab Crafters, Inc.*, 2007 WL 7034303 at *6.

## II.     *Defendants' Motion to Disqualify and Preclude the Testimony of Mr. Balin is Denied*

### A.     *Legal Standard*

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony. It provides:

> If scientific, technical, or other specialized knowledge will assist

> the trier of fact to understand the evidence or to determine a fact in
> issue, a witness qualified as an expert by knowledge, skill,
> experience, training or education, may testify thereto in the form of
> an opinion or otherwise, if (1) the testimony is based upon
> sufficient facts or data, (2) the testimony is the product of reliable
> principles and methods and (3) the witness has applied the
> principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.  Rule 702 "embodies a liberal standard of admissibility for expert opinions . . . ."  *Nimely v. City of New York,* 414 F.3d 381, 395 (2d Cir. 2005).  The Supreme Court has made clear that a district court has a "gatekeeping" function under Rule 702 and must "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand."  *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 597 (1993).  The Supreme Court subsequently "clarified that, whether a witness's area of expertise was technical, scientific, or more generally 'experienced-based,' Rule 702 required the district court to fulfill the 'gatekeeping' function of 'mak[ing] certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  *Nimely*, 414 F.3d at 396 (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)) (alteration in the original).

The Second Circuit has articulated three inquiries that a district court must undertake as part of its "gatekeeping" function under Rule 702: (1) whether the "witness is 'qualified as an expert' to testify as to a particular matter," (2) whether "the opinion is based upon reliable data and methodology," and (3) "whether the expert's testimony (as to a particular matter) will 'assist the trier of fact.'"  *Id.* at 397 (quoting Rule 702).  Here, Defendants have challenged both the

reliability of Mr. Balin's opinions and their relevance in assisting the trier of fact.

"In gauging reliability, the district court should consider the indicia of reliability identified in Rule 702 . . . ." *Willis v. Amerada Hess Corp.*, 379 F.3d 32, 48 (2d Cir. 2004). The three indicia of reliability set forth in Rule 702 are not, however, exhaustive. The Supreme Court has noted that "the test of reliability is 'flexible,' and *Daubert's* list of specific factors neither necessarily nor exclusively applies to all experts or in every case." *Kumho Tire Co.*, 526 U.S. at 141. "Rather, the law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination." *Id.* at 142. In *Kumho Tire Co.*, the Supreme Court noted, however, that "some of *Daubert's* questions can help to evaluate the reliability even of experience-based testimony," and that it might be helpful for a trial judge to inquire of the expert whether, for example, the "expert's experience-based methodology has produced erroneous results," or "whether his preparation is of a kind that others in the field would recognize as acceptable." *Id.* at 151.

### B.      Court as Trier of Fact

The parties have agreed to try this case at a bench trial. (*See* Decl. of Robert M. Calica, dated June 3, 2010 ("Calica Decl."), Ex. A at 5.) Plaintiffs contend that "where, as here, issues of fact are to be determined at a bench trial, it is generally recognized that the objectives of Daubert, i.e., to ensure that only reliable and relevant expert testimony *is presented to the jury*, are not implicated." (Pls.' Opp'n at 11) (internal quotation marks omitted, emphasis in the original) (collecting cases from within and outside Second Circuit). In response, Defendants assert that "[s]imply because this case will not be tried before a jury does not abrogate the standards for expert testimony." (Reply Mem. at 3.)

A district court has broad discretion with respect to the admissibility or exclusion of expert evidence. *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir. 1995). That the court will be the trier of fact affects both its discretion and its gatekeeping function. A court has greater flexibility in satisfying its gatekeeping function vis a vis expert testimony where it is the trier of fact given the absence of the need to protect juries from dubious expert evidence. *See, e.g., Victoria's Secret Stores Brand Mgmt., Inc. v. Sexy Hair Concepts, LLC*, 2009 WL 959775, at *6 n.3 (S.D.N.Y. Apr. 8, 2009) ("Moreover, where a bench trial is in prospect, resolving *Daubert* questions at a pretrial stage is generally less efficient that simply hearing the evidence; if [the] objections are well-taken, the testimony will be disregarded in any event."); *New York v. Solvent Chem. Co.*, 2006 WL 2640647, at *1 (W.D.N.Y. Sept. 14, 2006) (noting that the "primary purpose of the holdings in *Daubert* and *Kumho Tire*," which is the protection of juries from "technical evidence of dubious merit . . . is not a prevailing concern where, as in this case, the court functions as the trier of fact"); *Am. Home Assur. Co. v. Masters' Ships Mgmt., S.A.*, 2005 WL 159592, *1 (S.D.N.Y. Jan. 25, 2005) ("As this will be a bench trial, there is no concern with protecting a jury from 'being bamboozled by technical evidence of dubious merit.'").

### C.     *Reliability of the Expert Testimony*

Defendants assert that Mr. Balin "lacks good grounds" for his "opinion regarding what a 'reasonable tenant' or a 'reasonable attorney' would do," because that opinion is based solely on "his personal experience" and "a poll of his law partners within his practice." (Defs.' Mem. at 14.) Defendants contend that this "casual poll of his law partners" reflects only a "small sample" of attorneys, and that Mr. Balin's "stated methodology is flawed because of the analytical gap between what he and his partners might do and what all lawyers in the New York Metropolitan

area might do under a set of unique site-specific circumstances." (*Id.* at 14-15.)

Mr. Balin made clear in the Expert Report, however, that his opinion regarding what "a reasonable commercial Tenant of the Premises in Nassau County in the years 2006-2007" would do is based on his "professional experience." (Ruskin Aff., Ex. C at 7; *see also* Balin Dep. at 12-15, 33-37, 48-50, 54-55.) The Court finds that Mr. Balin's professional experience alone is sufficient to render the opinions contained in his Expert Report sufficiently reliable. That Mr. Balin "bounced this [question] over . . . with some of [his] law partners, who agree[ed] with [him]," does not erode this finding. (*See* Balin Dep. at 39.)

Defendants also contend that "Mr. Balin's statement that the 'risk' that DEC 'might have required' installation of remediation devices <u>on-site</u> to remediate <u>off-site</u> contamination is unsupported." (Defs.' Mem. at 13.) Defendants assert that "there was no indication that any further on-site . . . remediation would be required, . . . [and] Mr. Balin testified that he did not review the environmental reports for this site." (*Id.*) Plaintiffs argue in opposition that "defendants can point to no aspect of Mr. Balin's opinions . . . which depend on the ultimate veracity or accuracy of the environmental reports or other scientific data underlying the admittedly open spill proceeding." (Pls.' Opp'n at 17.)

"Although expert testimony should be excluded if it is speculative or conjectural, or if it is based on assumptions that are so unrealistic and contradictory as to suggest bad faith, or to be in essence an apples and oranges comparison, other contentions that the assumptions are unfounded go to the weight, not the admissibility of the testimony." *BIC Corp. v. Far E. Source Corp.*, 2001 WL 1230706, at *1 (2d Cir. Oct. 12, 2001) (internal citations and quotation marks omitted) (collecting cases); *see also Tyler v. Bethlehem Steel Corp.*, 958 F. 2d 1176, 1188 (2d

Cir. 1992) (refusing to strike expert testimony allegedly based upon unfounded assumptions; challenge to expert testimony "goes to the weight, not the admissibility, of the testimony").

Here, in opining that "[t]here was a substantial risk that in the event further onsite remediation was determined by the DEC to be required in order to remediate offsite contamination . . . the DEC might have required the installation of remediation devices such as an air stripper, monitoring wells, and other devices," Mr. Balin relied upon deposition testimony given by Ms. Hart, including the following:

> Q: Have you been involved in circumstances where there has been contamination from a gasoline service station where the MTBE slug has migrated to another property off-site and the remediation, be it airstripper or any of the other methods you described, were actually installed on the original gas station site?
>
> A: It has been done, but it also has been done off-site as well
> . . . .

(Ruskin Aff., Ex. B at 45-46.) Ms. Hart testified that, in her experience, remediation methods have been installed on the original premises when pollutants have migrated from the original premises to another property. Based upon this information, Mr. Balin concluded that while the DEC "requir[ed] Shell to continue to perform various additional tests and computer modeling" before it issued the No Further Action Letter, the DEC could find off-site pollution that had migrated from the Premises, and that the DEC could, in that event, install remediation measures on the Premises itself. (*See* Pls.' Opp'n at 13-14.) Essentially, this opinion dovetails with Mr. Balin's concurrent conclusion that a reasonable tenant would not lease the Premises while the spill number remained open. The Court does not agree with Defendants' contention that Mr. Balin's testimony on this point is "manufactured from whole cloth," (*see* Defs.' Mem. at 14) and

18

declines to strike it on this basis.

Finally, Defendants assert that "there is no support for Mr. Balin's definition of 'corrective action,'" because "Mr. Balin offered the opinion that monitored natural attenuation is not a corrective action, although Nicole Hart, the DEC staffer responsible for oversight of the Site testified to the contrary." (Defs.' Mem. at 12.) The Court declines to find that differences of opinion between Mr. Balin and Ms. Hart render the opinions contained in Mr. Balin's Expert Report "baseless." (*See id.*) Moreover, the Second Circuit has held that to the extent a party "asserts that there were gaps or inconsistencies in the reasoning leading to [the expert's] opinion . . ., such arguments go to the weight of the evidence, not its admissibility. *Campbell v. Metro. Prop. & Cas. Ins. Co.*, 239 F. 3d 179, 186 (2d Cir. 2001).[3]

For these reasons,[4] the Court finds that Mr. Balin's Expert Report bears sufficient indicia of reliability and will not strike it or preclude his testimony on this ground.

### D. *Relevance of the Expert Testimony*

"Weighing whether the expert testimony assists the trier of fact goes primarily to

---

[3] For the first time on reply, Defendants argue that the definition of the term "corrective action," as set forth in Article 22.C of the Lease, is a "central issue for which expert testimony is proffered." (Reply Mem. at 2.) Defendants insist that, "[w]ithout question, scientific or technical expertise is required to opine on the definition of 'corrective action,'" and that "Mr. Balin is proffered as a zoning and real estate attorney and not . . . as a scientific expert." (*Id.*) Plaintiffs subsequently made clear, however, that "Mr. Balin is not being proffered as an expert on the issue of whether or not monitored natural attenuation is a form of corrective action." (Pls.' Aug. 19, 2010 letter.)

[4] Defendants also argue that Mr. Balin's deposition testimony makes clear his "attempt to usurp the Court's role by imposing his own opinions of contract interpretation" upon the trier of fact. (Reply Mem. at 4.) As Plaintiffs point out, however, nowhere in Mr. Balin's Expert Report does he opine on the interpretation of any contractual provision contained in the Lease. (*See* Pls.' Opp'n at 16.)

relevance." *Equal Emp't Opportunity Comm'n v. Bloomberg L.P.*, 2010 WL 3466370, at *6

(S.D.N.Y. Aug. 31, 2010) (citing *Daubert*, 509 U.S. at 591). Defendants assert that the Expert

Report and Mr. Balin's anticipated trial testimony are not relevant because Mr. Balin's expressed

opinions "are speculative and do not address the relevant inquiries: the intentions of the parties at

the time the Lease was drafted; the actual condition of the Premises during the months at issue;

and the extent to which the Premises could be used by a prospective tenant." (Defs.' Mem. at

15.) In opposition, Plaintiffs argue that "the key issue to be determined . . . hinges upon whether

the DEC's admitted failure and refusal to issue a 'No Further Action Letter' until September 10,

2007, constituted 'corrective action [which] substantially prevents the Premises from being used

by a Lessor and other Tenant' under the parties' Lease." (Pls.' Opp'n at 18.)

This Court has previously delineated a central question to be resolved in this litigation, to

wit:

> A rational juror could find that until the spill proceeding was
> officially closed via a No Further Action letter, Plaintiffs would be
> unable to use or rent the Premises due to the uncertainty
> surrounding its environmental status. On the other hand, a
> reasonable factfinder could find that the Premises were usable as of
> March 20, 2007, the date the DEC stated that redevelopment of the
> DEC should not be delayed due to the spill case as "the soils do not
> create an unacceptable exposure pathway to new construction."

(March 30 Order at 20.) The Court finds that Mr. Balin's opinion, as an attorney with

"considerable knowledge and expertise with respect to the marketability of the Premises during

the pendency of the open spill proceedings and prior to the issuance of the No Further Action

Letter," (Pls.' Opp'n at 19) bears relevance to, and will assist the trier of fact in resolving, this

question.

## *CONCLUSION*

For the reasons set forth above, Defendants' motion to strike the Expert Report and preclude Mr. Balin from testifying at trial is DENIED.

**SO ORDERED.**

Dated:  Central Islip, New York
        February 28, 2011

                                          _____/s/_____

                                          Denis R. Hurley
                                          Unites States District Judge