UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------X
CDR-WANTAGH, INC. and CHRISTINE
D. RIVERA, Individually and as
Trustee for the benefit of JAMES      <u>MEMORANDUM AND ORDER</u>
DELYANIS,                             07-CV-4497(DRH)

                Plaintiffs,

           -against-

SHELL OIL COMPANY and MOTIVA
ENTERPRISES LLC,

                Defendants.
--------------------------------X
A P P E A R A N C E S:

For the Plaintiffs:
    Rosenberg Calica & Birney LLP
    100 Garden City Plaza
    Suite 408
    Garden City, New York
      By: Robert M. Calica, Esq.
         Edward Michael Ross, Esq.
         Megan F. Carroll, Esq.

For Defendants:
    Epstein Becker & Green, P.C.
    250 Park Avenue
    New York New York 10177-1121
      By: William A. Ruskin, Esq.
         Victoria Marie Sloan, Esq.

HURLEY, Senior District Judge

        Plaintiff CDR-Wantagh, Inc. ("CDR Wantagh"), and

Christine D. Rivera ("Rivera") (collectively "plaintiffs") seek

judgment against defendant Shell Oil Company ("Shell"), as

Tenant, and its assignee, defendant Motiva Enterprises, LLC

("Motiva") (collectively "defendants" or "Shell")[1] for certain

---

    [1] Shell was the corporate defendant which entered into the
Lease with plaintiffs.  Moreover, Shell was the defendant

payments based upon an expired Lease (the "Lease") of a former gas station premises located at 32-30 Sunrise Highway, Wantagh, New York (the "Premises").

BACKGROUND

A.  <u>DEC Spill Proceeding and Nature of Dispute</u>

The Premises was the subject of a Spill Proceeding opened by the New York Department of Environmental Conservation ("DEC") in 2001, after Shell reported finding evidence of contamination at the site.  The DEC proceeding continued following the expiration of the Lease, and was not formally closed until that agency issued a No Further Action Letter ("NFAL") in September 2007.

The central issue is whether Shell is required, under Article 22.C of the Lease (entitled "Post-Termination Rent on a Month-to-Month Basis Until Corrective Action is Completed"), to pay post-termination rent and real estate taxes from October 1, 2006 when Shell ceased making payments until September 10, 2007 when the DEC issued its NFAL, thereby concluding the Spill Proceeding.[2]

---

corporate entity commonly referred to by counsel during the trial.  Accordingly, the only specifically named defendant hereafter will be "Shell," devoid of any further reference to "Motiva."

[2] <u>But see</u> Findings of Fact # 11 <u>infra</u> indicating that a portion of the post-lease payment dispute was settled in April 2007.

B.  Text of Article 22 of Lease and Parties' Summary
    Judgment Motions

          Before addressing Article 22.C, a brief recitation of

Articles 22.A and 22.B is required.  Article 22.A of the Lease,

entitled "Contamination Indemnity," provides in pertinent part:

          Subject to the conditions and limitations
          contained in this article, SHELL agrees to
          indemnify and hold [plaintiffs] harmless from
          both the requirement of performing corrective
          action and/or the cost of performing
          corrective action and the cleanup of
          contamination, if any, of the environment and
          soil at the Premises and/or other property,
          arising from SHELL's use of the Premises and
          which are ordered by any federal, state or
          local governmental unit or agency, and for
          reasonable attorney fees and court costs
          incurred as a result of any such
          contamination.

(Pls.' Ex. 1, Art 22.A at 10-11.)

          Article 22.B, entitled "Testing and Corrective Action,"

provides, in part:

          Prior to expiration of this Lease, but no
          earlier than 180 days before such expiration,
          SHELL shall test the condition of the
          Premises for the presence of petroleum
          contamination.  If SHELL determines the data
          available indicates the presence of
          subsurface petroleum contamination that may
          require corrective action, SHELL shall take
          corrective action with respect to petroleum
          contamination caused by SHELL's use of the
          Premises if, and to the extent, required in a
          manner approved by the governmental authority
          exercising jurisdiction over the matter . . .
          SHELL may complete the corrective action
          before or after expiration of this LEASE.

(Id., Art. 22.B at 11-12).

-3-

As noted, the provision at the center of the present dispute is Article 22.C.  That Article provides:

> In the event at the termination of this Lease there exists on or under the Premises contamination caused by SHELL's use or occupancy of the Premises for which corrective action is ordered by an applicable governmental agency, SHELL shall continue to pay rent to [plaintiffs] on a month to month basis in the event SHELL's corrective action on the Premises in any respect substantially prevents the Premises from being used by [plaintiffs] or another tenant.
>
> . . . .
>
> Additionally, SHELL shall continue to pay all real estate taxes and charges in accordance with the provisions of Article 10 of this Lease.  SHELL shall continue to pay such post-termination rent and any and all real estate taxes in accordance with the provisions of this sub-Article 22.C until the first to occur of: **(1) such time as SHELL shall have obtained all applicable federal, state and local approvals regarding the satisfactory removal of SHELL caused contamination from the Premises, or (2) such time as SHELL's corrective action no longer substantially prevents the Premises from being used by [plaintiffs] or another tenant.**

(Id., Art. 22.C, at 12-13 (emphasis added).)

Both parties previously moved for summary judgment. Those applications were denied by Memorandum and Order dated March 31, 2009, with the Court concluding that the pivotal portion of the Lease, Article 22.C, is ambiguous in that:

> [a] rational juror could find[, as plaintiffs maintain,] that until the spill proceeding was officially closed via a No Further Action

> letter, Plaintiffs would be unable to use or
> rent the Premises due to the uncertainty
> surrounding its environmental status.  On the
> other hand, a reasonable factfinder could
> [adopt the defendants' position and] find
> that the Premises were usable as of March 20,
> 2007, the date the DEC stated that
> redevelopment of the DEC should not be
> delayed due to the spill case as "the soils
> do not create an unacceptable exposure
> pathway to new construction."

(Mar. 31, 2009 Mem. and Order at 20 (citation deleted)).

C.  Positions of the Parties

Plaintiffs contend, relying in part on the testimony of
their expert witness, Herbert M. Balin, Esq., "that, prior to the
issuance of the No Further Action Letter by the DEC, a
'reasonable' future tenant (such as North Fork) 'would be unable
to use or rent the Premises.'" (Pls.' Post-Trial Mem. at 4-5
(internal emphases deleted).)

The defendants' position in opposing the relief
requested is multifaceted.  However, its primary focus is upon
the disjunctive nature of the two events listed in Article 22.C,
the first of which to occur will bring about the end of Shell's
obligation to make post-lease payments.  In defendants' view,
plaintiffs' reliance on September 10, 2007, that being the date
that the NFAL was issued by DEC, is misplaced.  Instead, the
argument continues, the controlling date, quoting from Article
22.C, is the time when "Shell's corrective action no longer
substantially prevent[ed] the Premises from being used by

[plaintiffs] or another tenant," which, at the latest, was March 20, 2007, i.e. the date of the DEC's letter to the Town of Hempstead indicating that "[r]edevelopment of the site should not be delayed due to the spill case." (Defs.' Ex. 53.)

D. **Bench Trial**

The case was tried before me, non-jury, on the following days in 2011: March 21st, March 22nd, March 23rd, May 12th and May 21st. The purpose of this Memorandum and Order is to furnish my post-trial Findings of Fact and Conclusions of Law pursuant to Fed. R. of Civ. P. 52(a)(1).

<u>FINDINGS OF FACT</u>

A. **Lease Agreement Between Plaintiffs and Shell**

1. Plaintiffs are the owners of the Premises located at 3230 Sunrise Highway, Wantagh, New York. (Compl. ¶ 1.)

2. Prior to 1982, Rivera's father owned the Premises and negotiated a lease with Shell Oil Company for the operation of a gasoline service station. (Tr. 32:4-18.)

3. In 1982, Rivera assumed management of the Premises and has managed the Premises continuously since that time. (Tr. 32:7-12.)

4. Rivera is not familiar with the terms of the earlier lease that her father negotiated with Shell. (Tr. 164:6-9.)

5.  Rivera does not know how many terms in the
Shell Lease were brought forward from the prior lease.  (Tr.
164:20-165:6.)

6.  Plaintiffs and Shell entered into a Lease
dated September 27, 1996 for the continued operation of a
gasoline service station on the Premises.  (Pls.' Ex. 1.)

7.  The Lease was for a term commencing on October
1, 1996 and expiring on September 30, 2006.  (Id., Art. 3.)

8.  The record is muddled as to whether Shell, or
plaintiffs' predecessor in title, or plaintiffs through their
counsel, or some combination thereof, drafted Article 22.C and
thus bear responsibility for its ambiguity.[3]  (Compare Tr. 36:3-6
(Rivera on direct: "Well, Shell prepared the lease and presented
it to us.  And we then basically negotiated the rent and the term
of the lease."), with Tr. 164:4-165:6 (Rivera on cross-
examination: "I'm not that familiar with that lease at all"
[referring to the lease her father had earlier negotiated with
Shell for the Premises, including the question of whether that

---

[3] Neither party has requested that I construe the "ambiguous
language . . . against the interest of the party that drafted it"
Painewebber, Inc. v. Bybyk, 81 F.3d 1193, 1199 (2d Cir.
1996)(internal quotation marks omitted), possibly because the
identity of that party is unclear.  A more probable explanation
is that both plaintiffs and defendants are of the view, or at
least were prior to trial, that the relevant portions of the
Shell Lease are unambiguous and furnish compelling support for
their respective - albeit diametrically opposed - positions.

lease had an article mirroring, or substantively akin to Article 22.C]); see also Tr. 165:21-25.)

      9.  The Shell Lease expired in keeping with its terms on September 30, 2006. (Joint Pre-trial Order, Stipulated Fact # 8.)

      10.  Defendants returned the keys to the Premises under cover letter dated December 8, 2006.  (Defs'. Ex. 38; Tr. at 72:17-24.)

      11.  The parties entered into a settlement agreement in April 2007, resolving plaintiffs' claims to post-termination rent for the period October 1, 2006 through January 31, 2007, and real property taxes for October 1, 2006 through December 31, 2006.  (Joint Pre-trial Order, Stipulated Fact # 23).

B.  The Premises' Environmental History

      12.  The investigation of the Premises began with a voluntary assessment program instituted by Shell ("GRASP") in 2001 which involved the testing of soil and groundwater beneath multiple gas station sites to determine if such sites had "some contamination that [Shell] didn't know about."  (Tr. 428:1-7.)

      13.  As a result of the GRASP, Shell identified contamination on the Premises consisting of "some dissolved levels of hydrocarbons in the groundwater, and a little bit of MTBE in [the] soil, as well as [in the] ground water."  (Tr.

429:1-6.)

14.  MTBE is the acronym for methyl tertiary butyl ether.  It is a gasoline additive intended to "improve air quality" with "very high solubility in water."  (Tr. 859: 13-19.)  As a result, "if you spilled gasoline on soil and it percolated down to ground water, . . .  and if . . . a fair amount went down, it would hit the ground water in a slug . . . that would then flow with the ground water towards the south shore."  (Id.: 18-860:1.)

15.  Shell's GRASP findings were reported to the DEC and a spill number was opened.  (Tr. 429:1-10; Pls.' Ex. 2.)

16.  Nicole Hart ("Hart"), "an engineer and geologist" with the DEC, (Tr. 248:6), believed that the contamination related to the MTBE slug was caused by a "one time, one spill" incident, as distinct from an "ongoing spill" such as from "a leaking tank."  (Tr. 267:3-268:12.)

17.  "[T]o determine whether the hydrocarbon concentrations detected in subsurface media (soil and ground water) . . . pose[d] any unacceptable risks to human health and the environment at either on-Site or off-Site locations," (Defs.' Ex. 9, at SOC 00757), Shell, inter alia, had "six monitoring wells" installed in July of 2001, along with "[t]hree well nests

. . . along the south (downgradient) side of the Site."[4]  (Id. at SOC 00759.)

18. Defendants retained independent environment consultants Geologic Services Corporation, and its successor corporation Kleinfelder, Inc. to perform groundwater and soil testing during the period from August 2001 to the summer of 2005 pursuant to DEC oversight.  (Defs.' Exs. 2-12.)

19. Monitoring wells sit flush to the ground, covered by a circular well cap of about two inches in diameter. Well nests are similarly flush with the ground, although a "little larger in diameter." (Tr. 337:22-339:8.)  Both, if located in a paved area, should be able "to support . . . tractor-trailer delivery trucks." (Tr. 551:20-552:1.)  Hart explained that "there are monitoring wells throughout [Long Island]." (Tr. 339:9-25.)  Wells are "very often [moved] for redevelopment purposes." (Tr. 550:20-25.)  The cost to install a

_____

[4]  As explained by Hart of the DEC, "[a] monitoring well is – starts from grade, is made of schedule 40 and would go down approximately 20 feet in this site and has a screen, a mill slotted screen which allows the water to go through at one depth.

A well nest has multiple depths.  There could be 2 foot intervals, so if you have a well that goes in at 20 feet, the center would be 20 feet, and then they would go 18, 16, and so forth.

So a well nest allows you to get groundwater samples at multiple depths, where a monitoring well is at one depth." (Tr. 274:1-11.)

well is in the "$1300 [to] $1500 [range]," and is probably less for a replacement well. (Tr. 551:7-15.)

20. The last groundwater monitoring on the Premises was done in 2005. (Tr. 336:11-14.) Although the DEC could have requested additional on-site sampling thereafter, it did not do so. (Id.:15-17.)

21. By letter dated February 28, 2006, Albert M. Tonn ("Tonn") of Kleinfolder opined to Hart that the site, apparently due to "natural attention,"[5] no longer posed an "unacceptable exposure[] to humans or the environment." (Defs.' Ex. 12, at SOC 02756.)

22. Defendants thereafter, in compliance with the Shell Lease,[6] removed the underground gasoline storage tanks ("USTs") and related equipment from the Premises in November 2006, along with "353.40 tons of impacted soil."[7] (Pls.' Ex. 15.) That soil was transported off-site for disposal (Tr. 437:1-

---

[5] As explained by Tonn, "natural attention" is the process whereby, based on "groundwater monitoring . . . you can see that the concentrations [of chemicals of concern] will degrade naturally over time." (Tr. 430:20-431:10.)

[6] See Pls.' Ex. 1, Article 18.A which provides in pertinent part: "Upon termination of this Lease and by no later than sixty (60) days thereafter, SHELL shall remove from, on, in, and under the Premises any and all underground storage tanks, any and all piping therefrom and any and all gasoline pump structures thereon."

[7] As explained by Hart, soil is impacted when "compounds of gasoline [are] observed and/or . . . smelled." (Tr. 282:12-15.)

3) on "November 16th of 2006."  (Tr. 440:15-18.)

23.  After the USTs were excavated, twenty soil samples were taken for laboratory analysis.  (Defs.' Ex. 43, at 97-98) (pagination referring to larger bold number at bottom, right side of page).)  Of those, one sample was contaminated "slightly above" the RSCO[8] limit for MTBE.  (Id. at 98 (referring to larger bold number at bottom, right side of page).)   However, the MTBE concentration in that sample was so slight as to obviate the need for any additional sampling or other work on the Premises.[9]  (Tr. 329:3-15.)

24.  "A representative from the NYSDEC [who] observed the gasoline tank pit . . . gave the authorization to backfill the excavation," (Defs.' Ex. 43, at 89 (referring to larger bold number at bottom, right side of page), which was done towards the end of November 2006.  (Defs.' Ex. 34, at SOC 03405.)

25.  Defendants' consultant, Kleinfelder, prepared a Tank Excavation Assessment and Soil Excavation Report ("TEA"), dated January 18, 2007, which detailed the tank excavation, soil removal activities, and soil sampling conducted in November 2006. (Defs.' Ex. 43.)  That report was sent to Hart on the same date, viz. January 18, 2007.  (Id.)

---

[8]  RSCO is the acronym for a DEC's recommended soil cleanup objectives.

[9] The remaining nineteen soil samples "were clean."  (Tr. 329:3-4.)

-12-

26.   The January 2007 TEA report, viewed in conjunction with the other data that Shell had submitted to her over the years, caused Hart to conclude that there was no longer "on-site MTBE."[10]  (Tr. 330:22-25.)

27.   Nonetheless, the DEC was concerned about off-site contamination caused by the possible migration of the MTBE slug.  (Tr. 330:13-331:4.)  As a result, the DEC asked on January 31, 2007 that a 1-D Domenico model be performed by defendants (Defs.' Ex. 44, at SOC 02103) in an effort to determine "the full fate and transport of [the] groundwater contamination."  (Tr. 288:8-16; see also Defs.' Ex. 79 (Decl. of David Puchaski, P.E.), ¶¶ 13, 15, 16).)

28.   The 1-D Domenico model, as well as the 3-D model discussed, infra, did not entail any further work on-site, but rather constituted "paperwork" based on samples and related information "previously collected."  (Tr. 433:1-9.)  Indeed, no physical work related to the open spill, such as taking water or soil samples, was required or occurred on the Premises after November of 2006.  (Tr. 477:19-478:2.)

29.   The monitoring wells and well nests were not removed from the Premises until after the NFAL was issued by the

_____

[10]   Yet, as of late January and early February 2007, no decision had been made as to whether to close the spill number, thus raising the possibility – which never materialized – of further on-site activity being required by the DEC.  (Tr. 290:5-292:8.)

DEC (Tr. 324:7-15) on September 10, 2007.  (Pls.' Ex. 42.)  The record, however, is devoid of evidence suggesting that presence of wells on the Premises, or any actions with respect thereto, interfered with the redevelopment of the Premises either before or after issuance of the NFAL.  What evidence there is, indicates to the contrary.  (Tr. 765:9-18.)

       30.  After defendants' consultants performed the 1D Domenico model and submitted the results in its March 2, 2007 Closure Request Report to the DEC, Hart's then-supervisor asked for a "three-dimensional [model to] see something we may be missing."  (Tr. 294:12-17; see also Defs.' Ex. 79 (Puchalski Decl.) ¶ 24 ("On or about March 14, 2007, Nichole Hart requested that Shell prepare a three-dimensional (3D) model because the 1D model could not accurately predict the transport of the possible MTBE slug from the site.").)

       31.  The DEC's response to Shell's 3-D modeling submission is unclear except to the extent the record reflects that the NFAL was issued thereafter absent any interim testing or modeling being ordered.  Moreover, Hart, at defendants' request, wrote a letter dated March 20, 2007 to the Hempstead Town Building Department.  The text of that letter reads as follows:

> During November 2006, Motiva terminated
> operations at the facility and subsequently
> removed all underground storage tanks,
> dispensers and lines from the site.
> Additionally a used oil tank was removed plus
> two hydraulic lift systems.  Following

removal, post excavation soil samples were
obtained and a Tank Excavation Assessment
report was submitted to the Department for
our review.

Motiva has conducted multiple groundwater
sampling events with this Department's
oversight to document that monitored natural
attenuation has been effective in reducing
the concentration of hydrocarbons in
groundwater.  As part of the environmental
investigation, an Exposure Assessment which
[evaluates] possible chemical exposure
pathways and the potential for chemical
exposures was completed.  Soil sampling
indicates the soils do not create an
unacceptable exposure pathway to new
construction at the site.  Motiva's
consultants continue to work with this
Department to reach case closure.
Redevelopment of the site should not be
delayed due to the spill case, and
redevelopment should continue following
normal permit review and approval processes.
. . .

(Defs.' Ex. 53.)

C.  <u>The North Fork Lease</u>

        32.  Plaintiffs entered into a lease agreement,

dated November 3, 2006, with North Fork Bank for the operation of

a bank branch on the Premises ("North Fork Lease.").  (Defs.' Ex.

32.)

        33.  Article 1(b)(ii) of the North Fork Lease

required plaintiffs as the Landlord to "provide a so-called 'No

Further Action Letter' or other evidence reasonably satisfactory

to Tenant that any and all Governmental Authorities . . .

including, without limitation, the New York State Department of

Environmental Conservation, are satisfied that the Demised

Premises is free of Hazardous Materials."  (Defs.' Ex. 32, Art.

(1)(b)(ii).)

34.  On January 22, 2007, Rivera emailed Shell's

Marjorie Hong ("Hong") to request an update regarding the

Premises.  (Defs.' Ex. 40.)

35.  Hong responded the same day that Beth Flowers

at Shell "may possibly be able to help . . . [North Fork] Bank[]

feel comfortable about Motiva's environmental indemnification."

(Defs.' Ex. 40; see also Tr. 90:4-12.)

36.  Shell routinely provides indemnification to

property owners to facilitate redevelopment of former Shell sites

(Tr. 586:17-25) and, in fact, agreed to do so when North Fork

Bank purchased a former Shell gas station from Shell in 2002.

Defs.' Ex. 35, at SOC 03398.)

37.  With respect to Article 1(b)(ii) of the North

Fork Lease and Article 22.C of the Shell Lease, plaintiffs agreed

in the November 2006 lease with North Fork to the bank's

insistence on a NFAL as a precondition of their obligation to pay

rent even though plaintiffs had known for weeks, if not months

prior thereto of the site's contamination and open spill

number.[11]  Yet, notwithstanding their burden of establishing that

---

[11]  Although Rivera typically used an American Online ("AOL")
email account to conduct business related to the Premises, she
did not preserve many of the communications relevant to the

the Premises was, in effect, commercially unusable until the NFAL was in hand, plaintiffs offered no evidence of efforts – via the use of real estate brokers, advertisements or otherwise – to market the property to others who might have been, unlike North Fork, willing to lease and pay rent for the property with its open spill number.  That such efforts might well have been successful – due to Shell's amenability to providing indemnification, or for some other reason – is evident from the history of former Shell gas stations in New York with open spill numbers having been redeveloped for other uses.

D.  History of Former Shell Gas Stations in New York
    With Open Spill Numbers Being Redeveloped for Other Uses

        38.  DEC open spill sites with monitoring wells are not uncommon on Long Island. (Tr. 339:9-16 [Hart: "There are large – a lot of monitoring wells on the island."]).  Open spill sites in Nassau County – i.e. the County in which the Premises is

---

present dispute.  (Tr. 173:7-182:11.)  As a result, defendants moved for sanctions based upon her purported spoliation of evidence, which application is sub judice.  More importantly, however, with respect to the issue now being discussed, Rivera is unable to recall when she learned of the on-site contamination. Nonetheless, she is chargeable with such knowledge as of early June 2006 when Shell's real estate counsel sent her attorney, as per her attorney's request, the environmental reports submitted by Shell to the DEC covering the period from the end of 2001 to February of 2006.  (See Defs.' Ex. 19 (June 7, 2006 letter to plaintiffs' attorney, Christian P. Staples, Esq.); see also Tr. 200:2-201:20; 230:25-233:17; 206:9-24 (Plaintiffs' counsel Staples sends the environmental reports to North Fork by letter dated October 11, 2006).)

located – have been developed routinely by developers and landlords.  (Id.: 17-25.)  Indeed, former Shell stations in the area with open spill numbers have been redeveloped as, e.g. a Starbucks, a car dealership and a TD Bank.  (Tr. 340:20-342:19.)

39.  Tellingly, Hart – who I found to be a highly credible witness based on her experience, objectively and demeanor — answered "yes" to the following question on cross examination: "So if someone[12] were to say to you that no one in their right mind would develop a property in Nassau County with an open spill number, you would disagree with that[?]" (Tr. 342:20-25.)

40. Hart's testimony dispelled the possibility that the DEC might require existing or new buildings on the Premises to be moved or otherwise altered if off-site contamination was discovered after she wrote to the Hempstead Building Department.  The relevant testimony reads:

> Q.  Ms. Hart, is it true that in the event that off-site contamination were detected as a result of further testing or modeling, that there still remain the risk or possibility that any new building constructed on the site would have to be demolished or removed to accommodate remedial activities?
>
>                      . . .
>
> A. No.

---

[12]  The "someone" referenced in defense counsel's question presumably is plaintiffs' expert witness Herbert M. Balin, Esq., whose testimony is discussed infra.

The department would not require on the information that we have for it to be removed or demolished.

Any further investigation that we would require, we would accommodate the existing buildings.

(Tr. 320:23-321:15.)

41.  Robert Rule ("Rule"), "a senior program manager for environmental [services]" for Shell (Tr. 570:22-24), whose testimony I also found to be credible, explained that (a) he is responsible for overseeing all Shell sites in New York State with open spill numbers (Tr. 575:21-576:9), (b) in that capacity, he has personal knowledge of many former Shell gasoline service stations in New York State that have been redeveloped notwithstanding open spill numbers (Tr. 573:5-23), and (c) in fact, none of those former Shell sites has been prevented from being redeveloped due to an open spill number.  (Tr. 575:12-20.)

42.  The gravamen of both Hart's and Rule's testimony – i.e. that open spill number have not precluded the redevelopment of former Shell gas stations for other uses in New York State – stands uncontradicted.[13]  Indeed, the record is devoid of any evidence to the contrary except for the instant dispute.  Plaintiffs proffer that their experience with North

---

[13]  It warrants mention that evidence of former Shell gas stations with open spill numbers being redeveloped for other uses was not mentioned, no less underscored by the parties in the memoranda submitted in 2008 with respect to their cross-motions for summary judgment.

-19-

Fork is indicative of the positions likely to have been taken by other possible prospective tenants.  The question of which other prospective tenants cannot be answered because, as previously mentioned, plaintiffs presented no evidence of their efforts to market the Premises to any individual or entity other than North Fork.

E.   Testimony of Plaintiffs' Expert

            43.  Plaintiffs called Herbert M. Balin ("Balin") an attorney with a long and distinguished career "specializing in land use law, in real estate transactions, and, as a consequence, environmental work." (Tr. 723:11-14.)  Balin testified that (1) the DEC September 10, 2007 letter was a NFAL, but Hart's March 20, 2007 letter to the Hempstead Town Building was not (Tr. 740:22-741:23), (2) properties previously housing gas stations "have incredible amount of new uses, office buildings, drugstores, 7-Elevens [-the] sky's the limit" (Tr. 743:12-14), (3) the attorney who drafted the provision in the North Fork Lease requiring, in effect, a NFAL as a precondition to closing, "was a reasonable, competent attorney and he did what I [, Balin,] would have wanted to do" (Tr. 750:8-751:1), and (4) the absence of a NFAL "substantially prevented [the premises] in any respect from being used by a reasonable tenant" (Tr. 756:13-20.) Balin further opined that "any reasonable, competent attorney would want that exact clause in the lease." (Tr. 751:2-3.)  Such

a provision is "essential" lest the client be exposed "to all kinds of [potential] liability" (Tr. 752:1-2), including liability under New York State's Navigation Law.

44. On cross-examination, Balin "assume[d]" that the persons who redeveloped gas stations with open spill numbers were represented by counsel, but understandably declined to speculate as to the concomitant advice furnished by such counsel to their clients. (Tr. 761:2-12.) As he explained: "I have no idea whether the attorneys recommended it [i.e. to proceed absent a NFAL], or whether the client acted on his own." (Id.:13-15.)

45. Balin also testified that he once represented a tenant who leased a "former service station with contamination" who took possession of the property without a NFAL based on the understanding that if a DEC problem surfaced, "the tenant would just take off and the landlord would be responsible."[14] (Tr. 768:22-769:20.)

46. Balin "d[idn't] think [he was] aware" that Shell had advised Rivera that it would assume all liability for costs incurred in connection with the environmental contamination of the site. (Tr. 772:8-17.) Additionally, Balin did not know

---

[14] Balin only recalled representing that specific tenant of a former gas station, but "think[s] there were some others in the [past] but [he] can't remember." (Tr. 769:2-7.) However, the legal advice that Balin gave to that "recent" client, (id.:4), who "t[ook] over the former service station with contamination," (id.:10-11), absent an NFAL, was not adduced.

whether the 1-D and 3-D modeling directed by the DEC required entry onto the Premises as distinct from computer modeling conducted off-site from samples earlier gathered. (Tr. 778:18-779:10.) However, Balin was of the opinion that a properly advised tenant would not go forward until a NFAL letter issued "because [the] DEC at any time could have asked for more corrective action." (Tr. 784:13-14.)

47. I found Balin to be an articulate, forthright professional. But as is implicit in his testimony, the client, in the final analysis, decides what risk to assume and under what circumstances. Which is to say, the notion that "any reasonable, competent attorney would want that exact clause in the lease" (Tr. 751:2-3), is not persuasive to the extent it is proffered as suggesting that the clause's inclusion is imperative regardless of the factual context. It not only suffers from overbreadth, but also runs counter to the fact that multiple former gas stations throughout the region have been sold or re-rented with open spill numbers. Conceivably, as to each of those incidents, the transferee acted without an attorney, or ignored caveats provided by counsel. But no evidence has been elicited directly or inferentially suggesting that to be the case or, beyond Balin's "one size fits all" opinion, that those transferees acted

unreasonably.[15]  In fact, nothing in the record indicates that any business, other than North Fork with respect to the subject premises, insisted on a NFAL as a precondition to closing on a former gas station site.

Defendants did not call an expert witness to challenge the opinion voiced by Balin; in that limited sense, Balin's opinion is uncontroverted.  But, of course, it is axiomatic that an expert opinion which is meant to assist the trier of fact does not somehow become binding in the absence of a contrary expert opinion.  The clear thrust of Balin's testimony is that a reasonable attorney would require an NFAL in all situations, while Hart takes a contrary view.  Cf. Findings of Fact ¶ 39, supra.  Hart's experience with respect to the redevelopment of former gas stations vastly overshadows that of Balin, and I find her opinion on the subject more closely dovetails with the reality of the situation.

CONCLUSIONS OF LAW

A.   Question Presented

In the final analysis, the question the Court must answer is as follows: Did the non-issuance of the NFAL until

_____

[15]  While there may be, as plaintiffs underscore, a dearth of information concerning the surrounding circumstances vis-a-vis those other sites, that shortcoming – assuming, arguendo, that it may legitimately be so labeled – does not detract from the fact that an open spill number has not been established to be inconsistent with, no less a substantial impediment to, redevelopment.

September 10, 2007 "substantially prevent[] the Premises from
being used by [plaintiffs] or another tenant" during the post-
lease termination period for which plaintiffs seek payment.
(Pls.' Ex. 1, Art. 22.C at 13.)

B.   Purpose of Trial

To partially reiterate, the Court denied the parties'
cross-motions for summary judgment, finding that the Shell lease,
specifically Article 22.C, was ambiguous given that it lends
itself to more than one reasonable interpretation.

In an effort to resolve that ambiguity and determine
the intent of the parties, the trial was held.

C.   Applicable Law

This case was initially commenced in the Nassau County
Supreme Court.  (Not. of Removal, ¶ 1.)  It was removed to
federal court "pursuant to 28 U.S.C. § 1441(b) because there is
diversity of citizenship among the parties under 28 U.S.C. §
1332(a)(1) [and] the amount in controversy is in excess of
$75,000 exclusive of interest and costs."  (Id. ¶ 8.)
Accordingly, the substantive law of New York as the forum state
is applicable, including its choice of law rules.  Cap Gemini
Ernest & Young, U.S., L.L.C. v. Nackel, 346 F.3d 360, 365 (2d
Cir. 2003); Tri-State Emp't Servs., Inc., v. Mountbatten Sur.
Co., Inc., 295 F.3d 256, 261 (2d Cir. 2002).  "In contract cases,
New York courts apply a 'center of gravity' or 'grouping of the

-24-

contacts' test."[16]  Glassalum Int'l Corp. v. Albany Ins. Co.,
2005 WL 1214333, at *5 (S.D.N.Y May 23, 2005)(citation deleted);
see also Fieger v. Pitney Bowes Credit Corp., 251 F.3d 386, 395
(2d Cir. 2001)("]W]hen an action involves real estate but does
not challenge the title to, or succession or conveyance of,
property, the situs of the property is viewed as one in the
spectrum of significant contacts considered in connection with"
the choice of law analysis)(internal quotation marks and citation
omitted).

          The parties, as evidenced by their post-trial
submissions, implicitly assume that New York contract law
controls.  That conclusion dovetails with the evidence before me
on the subject of contacts with New York.  As a result, the law
of that jurisdiction will be applied to plaintiffs' contract
claims based on Shell's refusal to make post-lease payments after
Hart's letter of March 20, 2007 to the Hempstead Building
Department.

          A contractual term or provision "is ambiguous [under
New York law] where a natural and reasonable reading of its
language allows for two or more possible meanings."  Roberts v.
Consol. Rail Corp., 893 F.2d 21, 24 (2d Cir. 1989).  "In such
cases, courts look to the acts and circumstances surrounding

_____

          [16]  Parenthetically, the Shell Lease does not contain a
choice of law provision.

-25-

execution of the ambiguous term to ascertain the parties'
intent."  Id.; see also Eternity Global Master Fund Ltd. v.
Morgan Guar. Trust Co. of N.Y., 375 F.3d 168, 177-78 (2d Cir.
2004) ("If the contract is ambiguous, extrinsic evidence may be
considered to ascertain the correct and intended meaning of a
term or terms.") (internal quotation marks omitted); Glassalum
Int'l Corp., 2005 WL 1214333 at *7 ("If the language of a
contract is ambiguous, extrinsic evidence of the parties' intent
is admissible . . . .  To determine intent, the court should look
to the contract as a whole and the parties' conduct, as well as
any evidence of surrounding facts and relevant circumstances,
industry custom and practice, and course of dealing.")(citations
omitted).  And "[u]nder New York law an interpretation of a
contract that has the effect of rendering at least one clause
superfluous or meaningless . . . . is not preferred and [is to]
be avoided if possible."  Galli v. Metz, 973 F.2d 145, 149 (2d
Cir. 1992) (internal quotation marks deleted).

     "Determining the intention of the parties to an
ambiguous contract is a question of fact to be resolved by the
factfinder."  In re Robbins Int'l Inc., 275 B.R. 456, 465
(S.D.N.Y. 2002) (citing Mellon Bank v. United Bank Corp., 31 F.3d
113, 116 (2d Cir. 1994)).  Where, however, "extrinsic evidence of
the parties' intent is not available, then contractual ambiguity
'presents not an issue of fact, but an issue of law for the court

-26-

to rule on.'" <u>Gallien v. Conn. Gen. Life Ins. Co.</u>, 49 F.3d 878, 884 (2d Cir. 1995) (quoting <u>Williams & Sons Erectors v. S. Carolina Steel</u>, 983 F.2d 1176, 1183-84 (2d Cir. 1993)).[17]

D.  <u>Extrinsic Evidence did not Shed Light on the Parties' Intent</u>

      The original Shell Lease was executed by Shell and Rivera's father.  Rivera did not know whether Article 22.C was carried over to the 1996 Shell Lease from that earlier lease, nor did she recall any communications she may have had with her attorney or another regarding Article 22.C prior the execution of the 1996 Shell Lease.  And no Shell representative was called to the stand to shed light on the intended meaning of the subject lease provision.  But, of course, extrinsic evidence concerning the contracting parties' understanding as to a particular contract provision is not limited to documents or witnesses bearing directly on the facts surrounding its execution.  Instead, evidence, e.g., pertaining to past, or even subsequent courses of conduct between the contracting parties in like situations may prove instructive.  <u>See</u> <u>Glassalum Int'l Corp.</u>, 2005 WL 1214333 at *7.  However, the scenario underlying the present dispute appears to be <u>sui generis</u>.  And other possible sources of extrinsic evidence of intent are not to be found in the trial record.  Accordingly, the meaning of the 1996 Lease is

---

[17] <u>Roberts</u>, <u>Eternity Global</u>, <u>Glassalum</u>, <u>In re Robbins</u> and <u>Galli</u> all involved, inter alia, one or more contract claims under New York law.

for me to decide as a matter of law.  See Gallien, 49 F.3d at
884.

In sum, the purpose of the trial vis-a-vis determining
the parties' intent was not realized.  Nonetheless, evidence was
presented at trial that bears on the issue of whether plaintiffs
have met their burden of proof as discussed infra.

E.   Plaintiffs Have Failed to Satisfy Their Burden of Proof

The answer to a problem often depends on how the
question is framed.  Here, counsel for plaintiffs explained
during his summation what he perceived to be my task thusly:

> The same economic circumstances extant
> in this case, which is Shell did not renew
> its lease, and it basically terminated its
> lease and surrendered the premises in 2007,
> is typical of what the contracting parties
> could anticipate in 1996, according to the
> trial testimony.
>
> Gas stations frequently are put to other
> uses.  They become 7-Elevens.  They become
> Starbucks.  They become supermarkets,
> drugstores, and in this case they became a
> bank branch.
>
> Viewed from the commercially reasonable
> perspective of the contracting parties, when
> this lease was made in 1996, as testified to
> [essentially] without impeachment and
> contradiction by Mr. Balin[, it was]
> reasonably foreseeable that a tenant such as
> North Fork Bank would be the future tenant
> whose use would be examined under 22C of the
> lease.
>
> According to Mr. Balin's persuasive and
> unimpeached testimony, it was commercially
> reasonable and foreseeable that a lawyer
> representing such a tenant, and the tenant

> itself, would require – in the case of an
> open spill proceeding before the New York
> State Department of Environmental
> Conservation, that there be a no further
> action letter.
>
> This doesn't mean that every tenant had
> to require a no further action [letter].
> This doesn't mean that there are tenants who
> would assume the risk of an open spill
> proceeding.
>
> To arrive at a reasonable interpretation
> of this ambiguous contract in light of the
> trial evidence, I submit all your Honor has
> to find is that North Fork Bank was a
> commercially reasonable tenant, whose
> requirement of a no further action letter was
> commercially reasonable, could have been
> anticipated in 1996, and whose refusal to
> weigh that requirement in the North Fork Bank
> lease was the proximate basis for North Fork
> Bank's refusal to occupy and use the premises
> in the words of [22C] of the Shell lease.

(Tr. 890:22-892:9.)

A partial restatement of the plaintiffs' position as

articulated during summation is found in their post-trial

memorandum.  Relying on Balin's testimony, the following proffer

is presented:

> [T]he mere fact that a commercial owner or
> tenant may elect to assume the risk of an
> Open Spill Proceeding does not mean that a
> hypothetical reasonable tenant in NFB's
> shoes, let alone NFB itself, would or should
> assume a similar risk.

(Pls.' Post-Trial Mem. at 20.)

I view plaintiffs' focus on their experience with North

Fork as myopic in that it essentially equates North Fork's

-29-

position vis-a-vis a NFAL with the stance likely to be taken by other persons or entities that might be interested in the Premises.  To begin with, the record is devoid of evidence demonstrating that in 1996 Shell and Rivera harbored the circumscribed understanding as to the meaning of "another tenant" in Article 22.C urged by plaintiffs' counsel.  Moreover, plaintiffs' position cannot be reconciled with the virtually undisputed evidence concerning the routine redevelopment of former gas stations in the area with open spill numbers.  And assuming for purposes of argument that "another tenant" is limited to one deemed to be a "reasonable tenant" (id.), the argument advanced fails to recognize that before the label of "reasonable" or "unreasonable" may legitimately be assigned to conduct, the attendant circumstances must be factored into the equation.

Presumably in an effort to downplay the significance of the other redevelopment evidence, plaintiffs complain that --

> [t]he trial record is bereft of any meaningful evidence concerning the specific lease terms or conditions, or the specific financial terms and conditions, of these 'other' redevelopment projects.  Indeed, the trial evidence demonstrates that with respect to the only other redevelopment project for which any meaningful evidence was adduced at trial, i.e., the 290 Main Street Property, that project was based on completely different terms and different circumstances than those presented here (i.e., property acquired as part of a tax-free 1031

exchange.)[18]

(Pls.' Response at 3 (the first of the three emphases added; the other two appear in the original).)

Notwithstanding plaintiffs' protestations to the contrary, the Court concludes that the "meaningful" component of the other redevelopment evidence is the coexistence of open spill numbers and unimpeded reconstruction on the subject sites.  That those other projects may have occurred under "different circumstances" and under different lease or sale terms does not go to that core issue.  By way of example, consider plaintiffs' reference to North Fork's acquisition in 2002 of the 290 Main Street property from Shell "as part of a tax-free exchange."  That transaction is not claimed by plaintiffs to be unreasonable, but rather as irrelevant based upon the claimed "different circumstances."  Although a tax-free exchange, of course, was not involved in North Fork's lease with CDR-Wantagh, the distinction drawn by plaintiffs is spurious.

Central to plaintiffs' argument "that a hypothetical

---

[18]  26 U.S.C. § 1031 provides in pertinent part:

(a) Nonrecognition of gain or loss from exchanges solely in kind.--

(1) In general.– No gain or loss shall be recognized on the exchange of property held for productive use in a trade or business or for investment if such property is exchanged solely for property of like kind which is to be held either for productive use in a trade or business or for investment.

reasonable tenant in NFB's shoes" would not assume the "leasing risk with respect to CDR-Wantagh's Premises" is the nature of that risk, (Pls.' Post-Trial Mem. at 22), including the possibility of being saddled with the cleanup costs for the Premises under New York Navigation Law 181(1). However, plaintiffs have presented no information – presumably because there is none – to indicate that North Fork's risk exposure was affected one iota by its acquisition of 290 Main Street via a 1031 tax-free exchange as distinct from some other method of transfer. In essence, then, the "different terms and different circumstances" implicated in the transfer of that property has not been shown to be germane for present purposes. And beyond that, the purchase of 290 Main Street, which plaintiffs attack as unreasonable, demonstrates the problem with categorical pronouncements as to what constitutes reasonable or unreasonable conduct untethered to factual context.

Simply put, to conclude, as plaintiffs request, that Shell's purported "corrective action [on the site][19] substantially prevent[ed] the Premises from being used by [plaintiffs] or another tenant," (Pls.' Ex. 1, Art. 22.C), would be out of sync with the credible evidence presented.

---

[19] The parties dispute whether "corrective actions" were, in fact, underway during the period for which plaintiffs seek payment. That initial issue need not be resolved, however, given plaintiffs' failure of proof as to the "substantially prevent[ed]" prong of the analysis.

In sum, the question to be answered by the Court in determining whether plaintiffs have met their burden of proof, is not simply whether North Fork was reasonable in refusing to proceed absent a NFAL, or even whether some other prospective tenants might have taken the same position had plaintiffs not confined their marketing efforts solely to North Fork.  The question is broader in scope given the language of Article 22.C.

As noted, the evidence establishes that the redevelopment of former gas stations with open spill numbers for a host of different uses is commonplace.  Plaintiffs, however, have limited the proof submitted in support of their claim against Shell solely to the position taken by North Fork, as supplemented, unconvincingly, by Balin's problematic opinion.  As a result, there is an insufficient factual predicate for the Court to conclude that because North Fork was not willing to take on the risks purportedly inherent in leasing the Premises subject to an open spill number, no other reasonable tenant would have agreed to do so either.  (See Findings of Fact # 42 (noting plaintiffs' failure to present evidence of any attempt to market the Premises to anyone other than North Fork).)  Moreover, and of equal import, the record is devoid of any evidence that they, i.e., the "LESSOR" under Article 22.C, were "substantially prevent[ed]" from using the Premises prior to the issuance of the NFAL in September 2007.  The absence of (1) such "other tenant"

evidence, and/or (2) of information demonstrating that the Premises was, in essence, unuseable by plaintiffs given its DEC status, requires that judgment be entered for defendants as to this claim.

CONCLUSION

Plaintiffs have failed to establish their breach of contract claim against Shell as alleged in their first cause of action.

Plaintiffs' other, viz., second cause of action is predicated on the purported delays in Shell obtaining the NFAL, thereby delaying plaintiffs' receipt of rental payments from North Fork.  As to that cause of action, it was not pursued at trial and is deemed to have been withdrawn.

What remains is the question of attorney's fees to Shell as the prevailing party pursuant to Article 30 of the 1996 Lease.  In that regard, defendants shall submit their application for same on or before January 29, 2012.  Plaintiffs' papers in response shall be submitted on or before February 10, 2012, with defendants' reply, if any, to be filed by February 20, 2012.

Once the issue of attorney's fees is resolved, judgment

will be entered in favor of defendants as to the two causes of action set forth in the Complaint.[20]

The above constitutes the Court's Findings of Fact and Conclusions of Law.

SO ORDERED.

Dated: Central Islip, New York
       December 20, 2011


_____/S/_____
DENIS R. HURLEY, U.S.D.J.

---

[20] Defendants' motion for spoliation will not be further addressed in that it is, in essence, rendered moot by the Court's conclusions in favor of defendants other than the request for "monetary sanctions." As to that portion of defendants' request, it is denied. "Monetary sanctions are appropriate 'to punish the offending party for its actions [and] deter the litigant's conduct, sending the message that egregious conduct will not be tolerated.'" Richard Green (Fine Paintings) v. McClendon, 262 F.R.D. 284, 292 (S.D.N.Y. 2009)(quoting In re WRT Energy Secs. Litig., 246 F.R.D. 185, 201 (S.D.N.Y. 2007)). The Court finds that plaintiff has not engaged in any conduct that rises to the level of "egregious" in nature, nor have defendants demonstrated either that they suffered prejudice as a result of plaintiffs' alleged spoliation, see McClendon, 262 F.R.D. at 292, or that a monetary sanction will serve "the remedial purpose of making [them] whole for costs incurred as a result of [plaintiff's alleged] wrongful conduct." See Chan v. Triple 8 Palace, Inc., 2005 WL 1925579, at *10 (S.D.N.Y. Aug. 11, 2005).